## The Inhabitants of HADLEY *versus* The Trustees of HOPKINS ACADEMY.

In 1657, Edward Hopkins, of England, devised estate, real and personal, to certain individuals, in full assurance of their trust and faithfulness in disposing of the same according to the true intent and purpose of the testator, namely, " to give some encouragement to those foreign plantations [New England] in breeding up of hopeful youth in a way of learning, both at the grammar school and college, for the public service of the country in future times." In 1664 the trustees executed an instrument under seal, by which they order, that " the property be equally divided between the towns of New Haven and Hadley, to be in each of those towns respectively managed and improved towards the erecting and maintaining of a grammar school in each of them, and the management thereof to be in the hands of our assigns, which are for that at New Haven, &c., and for that at Hadley, J. R., &c. These we constitute to be our trustees for the ordering of said estate and carrying on the work, wherein it is to be employed, in their town, hereby committing to them and investing them with full power to act in the same, in all respects, as ourselves, both in managing the trust themselves, and in choosing successors from time to time, &c., who &c. shall have full power to pursue and put in execution the pious end and intention of the worthy donor, yet reserving to ourselves while we live, the full power of a negative vote, for the hindering any thing that may cross that end." In 1664 another testator devised land " to the town of Hadley, for promoting and advancement of a school for learning." In the same year another testator devised " to the town of Hadley " certain real estate " to be improved towards the maintaining of a school ever." In 1666 the town passed the following vote: " The town have granted to and for the use of a grammar school in this town of Hadley, and to be and remain perpetually to and for the use of the said school," certain land specified in the vote. In 1669 one of the surviving trustees made a proposal to the town of Hadley, that he should appoint three persons, to be submitted to the town and to be approved of by them, and that the town should appoint two, and that these five, with himself whilst he lived, should have the sole disposal and management of the estate, in all respects, for the end to which it was bequeathed; and that the same five persons, with himself whilst he lived, should have the sole management of all other estate given by any donor, or which might be given while they survived, to the town of Hadley, for the promoting of literature or learning; that these trustees should have power to perpetuate the board by filling their own vacancies; and that the school should be called the Hopkins school. The town approved of three persons named by the trustee, and appointed two themselves, and voted that " the committee thus chosen should jointly and together have the ordering and full disposal of the estate given by the trustees of Hopkins to the town of Hadley, or any other estate or estates that were or might be given, either by the town itself or by any other donor, for the use, benefit and maintenance and promoting a grammar school to and for the use and in the town of Hadley." In 1675 another testator devised land to the town of Hadley, committing it to the care, disposing and ordering of S. S. &c. [naming the persons constituting the Hopkins school committee] to be by them disposed of (in case they quietly keep and remain in their committee ship for Hopkins school) unto Hopkins school, for Hadley ; but if they be put out or disturbed in that committeeship, then to be disposed of as they see meet, for the good of the town." It was *held*, that the legal estate in the property given by Hopkins, did not, by his will and the instrument made by his trustees in 1664, vest in the town of Hadley ; that the devise was not made for the purpose of founding a

common town school for the exclusive benefit of the inhabitants of that town, but was designed for the encouragement of all persons in that (then) newly settled part of the country, who should desire to avail themselves of the benefit of a grammar school adapted to instruct and qualify pupils for the university; that a long continued usage of admitting pupils from other towns than Hadley, to participate in the benefits of the Hopkins school, was of weight in establishing such construction of the devise; and that all the other donations above mentioned were to be held upon the same trusts and be appropriated to the same purposes, as the principal one from Hopkins.

It is probable, that in 1686 the county courts and the president and council of New England had jurisdiction over trusts of the kind above described.

BILL in equity. The bill alleges, that in 1657, Edward Hopkins, Esquire, a resident in the kingdom of Great Britain, by his last will bequeathed and devised as follows : " And the residue of my estate there (New England) I do hereby give and bequeath to my father Theophilus Eaton, Esquire, Mr. John Davenport, Mr. John Cullick and Mr. William Goodwin, in full assurance of their trust and faithfulness in disposing of it, according to the true intent and purpose of me the said Edward Hopkins, which is, to give some encouragement in those foreign plantations for the breeding up of hopeful youth, in a way of learning, both at the grammar school and college, for the public service of the country in future times. My further mind and will is, that within six months after the decease of my wife, five hundred pounds be made over into New England, according to the advice of my loving friends Major Robert Thompson and Mr. Francis Willoughby, and conveyed into the hands of the trustees before mentioned, in further prosecution of the aforesaid public ends, which, in the simplicity of my heart, are for the upholding and promoting of the kingdom of the Lord Jesus Christ in those parts of the earth."

That in 1664, Davenport and Goodwin, being the only surviving trustees, by an instrument under their hands and seals, after reciting the trusts and powers given to them in the will, proceed to execute the trust and dispose of the property confided to them, in manner following : " We therefore, the said John Davenport and William Goodwin, being the only survivors of the said trustees, for answering the trusts committed to us by the last will and testament of our worthy honored friend, do order and dispose of the said estate as follows &c. (disposing of a portion of the property confided to them, and then

proceeding :)   We do further order and appoint, that the rest
of Mr. Hopkins his estate, both that which is in New England
and the 500*l.* which is to come from Old England when it
shall become due to us after Mrs. Hopkins her decease, be
all of it equally divided between the towns of New Haven and
Hadley, to be in each of those towns respectively managed
and improved towards the erecting and maintaining of a gram-
mar school in each of them."

That in 1664, John Barnard, in his last will, devised " unto
the town of Hadley for promoting and advancement of a
school for learning, twelve acres, one rood and nine poles of
meadow land, perpetually to be and remain to the use aforesaid,
lying within the lands of the township of Hadley ; six acres
two roods and twenty-nine poles lying in the meadow called
Hockanum ; another parcel in the meadow called the Great
Meadow, containing five acres, two roods, twenty poles ;" and
that in a codicil he devised as follows : " To the use and
towards the maintenance of a school, I give perpetually my
piece of land lying in the Forlorn ; as also my piece of land
that lies in Hockanum ; and also that land I have given to a
school ; if there be not a school in Hadley at the decease of
my wife, then the land to be improved by four of the poorest
men in town till there be a school set up."

That in 1664, Nathaniel Ward devised as follows : Item,
to the town of Hadley I give, after the decease of my wife,
my now dwellinghouse, with about five roods or an acre and
half of land on which it standeth, and my lot of five acres,
more or less, in north meadow, and my lot in Hockanum, con-
taining nine acres, more or less ; to be improved towards the
maintaining of a school ever."

That in 1666, the town of Hadley passed the following
vote : " The town have granted to and for the use of a gram-
mar school in this town of Hadley, and to be and remain
perpetually to and for the use of the said school, the two little
meadows next beyond the brook commonly called the mill
brook, and as much land to be laid to the same as the commit-
tee chosen by the town shall in their discretion see meet and
needful ; provided withal, it be left to the judgment of he
said committee, that so much of the second meadow shall be

excepted from the said grant as that there may be a feasible and convenient passage for cattle to their feed."

That in 1669, by agreement between Goodwin and the town of Hadley, five persons were chosen, partly by Goodwin and partly by the town, as a joint committee, " who together with Goodwin while he lived," and after his decease, should jointly and together have the ordering and full dispose of the estate or estates given by Mr. Davenport and Mr. Goodwin (as trustees as aforesaid to Mr. Hopkins) to this town of Hadley, or any other estate or estates that ever may be given, either by the town itself, or any other donor or donors, for the use, benefit and maintenance and promoting a grammar school, to and for the use, and in the town of Hadley." That it was also agreed that the committee should have power to fill all vacancies in their number occasioned by death.

That in 1675, Henry Clark devised as follows : " My nine acre lot in Hockanum in the town of Hadley, and two acres and an half of my lot in the lower end of Great Meadow in Hadley, on the nether side of the lot, I give to the town of Hadley, committing it to the care, disposing and ordering of Lieut. Samuel Smith, Ensign Cooke, Deacon Tilton and Mr. John Russell junior, to be by them disposed of (in case they quietly keep and remain in their committee-ship for Hopkins school) unto Hopkins school, for Hadley ; but if they be put out of or disturbed in that committee-ship, then to be otherwise disposed of as they or the survivor of them see meet, for the good of the town."

That the committee above described and their successors, continued to have the management of the property and to appropriate its annual income agreeably to the uses and for the purposes above mentioned, until 1816, when the committee, in concurrence with the town of Hadley, petitioned the legislature for an act of incorporation ; and an act was accordingly passed, entitled " an act to incorporate the trustees of Hopkins Academy ; " that the trustees of the academy succeeded to and accepted of the trust above described ; and that in and by the act of incorporation, all the lands and moneys, which had been theretofore given or subscribed to the committee before mentioned, for the use of the school, are confirmed to the trus-

tees of the academy and their successors for ever, " for the uses designated by the donors."

That the plaintiffs hoped the trustees would have managed the property and appropriated the annual income thereof to and for the uses designated by the donors, and according to the agreement between Goodwin and the town of Hadley, for the use, benefit and maintenance and promoting a grammar school to and for the use of the town and its inhabitants, but that they refuse, and have for a long time refused, to administer the trust according to the directions of the donors and to appropriate the annual avails of the property to and for the exclusive use and benefit of the plaintiffs, and have appropriated the same, as well to the use and benefit of others, as of the plaintiffs, and sometimes in exclusion of the plaintiffs.

The bill then prays for disclosure and relief.

The defendants, in their answer, admit that Hopkins, Barnard, Ward, and Clark made the several devises, and that the town of Hadley made the grant, set forth in the bill.

They admit, that in 1664, Davenport and Goodwin, for the execution of the trust created by the will of Hopkins, made an instrument containing the clause recited in the bill, but they allege that, after that clause, the instrument proceeded as follows : " And the management thereof to be in the hands of our assigns, which are for that at New Haven at present, (and so to continue unless some other way be by us agreed on,) the town court of New Haven, consisting of magistrates and deputies and the officers of the church at New Haven, and for that at Hadley, John Russell junior, pastor of the church of Christ at Hadley, Lieut. Samuel Smith, Andrew Bacon and Peter Tilton ; these we the said John Davenport and William Goodwin do appoint and constitute to be our trustees for the ordering of said estate and carrying on the work, wherein it is to be employed, each in their several towns respectively , hereby committing to them and investing them with full power to act in the same, in their several towns respectively, in all respects, as ourselves, both in managing the trust themselves and in choosing successors from time to time, as they shall see meet, who, or the major part of whom (or, in case at any time the rest of the trustees being taken away before others be

chosen, any of whom) may and shall have full power to pursue and put in execution the pious end and intendment of the worthy donor ; yet reserving to ourselves while we live, the full power of a negative vote for the hindering any thing that may cross that end."

The defendants further say, that the agreement made in 1669, between Goodwin and the town, was as follows : " Mr. Goodwin proposeth as that wherein he is willing to concur, viz. as to the ordering the estate distributed and given by Mr. Davenport and himself (as trustees of Mr. Hopkins) to the town of Hadley, donors of the said estate, both for the present and future, he the said Goodwin hath chosen three persons, or will choose them, to have power in the premises ; he is willing also that the town should give their approbation of said persons ; as also that the town should make choice of two more able and pious men, which five persons, together with himself, shall have the sole and full dispose and management of the estate above expressed, in all respects, for the end to which it is bequeathed. 2. As also the said five persons, together with himself while he lives, to have the sole dispose and management of all other estate or estates given by any donor, or that may be while they survive, to the town of Hadley, for the promotion of literature or learning. 3. These five persons to continue, abide and remain in the work above expressed, till death or other providence of God remove any of them, and the survivors to choose to themselves the full number aforesaid. 4. Mr. Goodwin desires the name of the school may be called, the Hopkins School." Which communication being so made to the town of Hadley on March 20, 1669, the town, on the 29th of the same March, *voted,* " that Mr. Goodwin be sent to by the town, to know the persons he will make choice of as respects the premises. He returns, that he has chosen Mr. John Russell, pastor of the church at Hadley, Lieut. Samuel Smith, and Aaron Cook ; and the said town voted their approbation of Mr. Goodwin's choice. The town also voted Nathaniel Dickinson and Peter Tilton to join with the persons before mentioned, as a joint committee, who, together with Mr. Goodwin while he lives, and after his decease, shall jointly and together have the ordering and full

21 *

dispose of the estate or estates given by Mr. Davenport and Mr. Goodwin (as trustees as aforesaid to Mr. Hopkins) to the town of Hadley, or any other estate or estates that are or may be given, either by the town itself, or any other donor or donors, for the use, benefit and maintenance and promoting a grammar school to and for the use and in the town of Hadley ; as also jointly and together to do, act and conclude, finish and execute, any thing respecting the premises, faithfully and according to their best discretion.   Voted also by the town, that as to the five persons, before expressed, if any decease or be otherwise disabled by the providence of God, the rest surviving shall have the sole choice of any other in the room and place of those surceasing, to the full number of five persons, provided they be known discreet, pious, faithful persons. And the town directed Mr. Clark and Peter Tilton to present the premises to the court to be recorded."

They further state, that in 1671, the town granted a piece of land near the corn mill, for the erecting a dwellinghouse upon the same for a miller, which grant had this provision, viz. that whatever land or estate, with the said house and mill &c., that hath been given by the town of Hadley, or by any other, for the maintaining a grammar school there, be ordered, managed and disposed by the present school committee in being, and after them by their successors whom they shall choose, provided they be still pious, discreet, faithful men ; otherwise the said grant to be void and invalid to the end and purposes aforesaid."

They further state, that at a county court held at Springfield in September, 1682, an order was passed accepting and allowing a return from the committee of the Hopkins school, and taking notice that John Russell, Aaron Cook, Philip Smith and Samuel Partridge constitute the committee and approving of them all, and desiring their further management and carrying on of the affairs of the school from time to time, which the court would be always ready to promote and encourage as need might require.

They further state, that while the care of the school was thus lawfully in the hands and under the oversight of a committee with full powers to manage the same without the interven-

on of the town, yet about August 23, 1686, the town voted " to take into their own hands, to manage, order and dispose to the use of a school in the town of Hadley, all the estates of houses and lands bequeathed and given by any donor or do nors, in their last wills and testaments, to the town of Hadley, or to a school in said town, as the legacy of Nathaniel Ward, John Barnard and Henry Clark ;" which interference on the part of the town induced the committee of Hopkins school to apply to the county court held at Springfield in September, .686, being a court having jurisdiction of the premises, where-.:pon the following order was passed, viz. " The declining es tate of Hopkins school in Hadley being presented to this court by the Rev. Mr. John Russell, Aaron Cook, Joseph Kellogg and Samuel Porter, the committee of said school, for that some of Hadley do disturb or obstruct the management of the estate of said school, therefore this court do order and declare, that the whole donations to a school there, from the charitable donors, be all employed and improved for and towards the maintenance of the grammar school in Hadley ; it appearing that the intent of Mr. Henry Clark, in what he gave to a school, was, that it should go and be employed to the said school called Hopkins school. Also the like doth appear as to goodman Ward's gift. And goodman Barnard's gift may as well be taken to and for that school as any other. Where fore this court order, that all said gifts and others, with the land given by Hadley town, be all accordingly improved by the aforesaid committee."

They further state, that upon application duly made to the president and council of his (then) Majesty's territory and dominion of New England in America, upon the concerns of the Hopkins school and the funds thereof, it was, on Decem ber 8, 1686, ordered by the president and council, " that the ccmm ttee for Hopkins school be and remain the feoffees of the grammar school in said town, and that Mr. Partridge be and hereby is dismissed from any further service in that mat er, and that the said committee make report of the present estate of Mr. Hopkins' and other donations to said school, (which, having been orderly annexed to the grammar school, are hereby continued to that service,) unto the next county

Hadley<br>v.<br>Hopkins<br>Academy.

court of Hampshire, who are hereby empowered to supply the place of Mr. Partridge with some other meet person in Hadley, and that the said court do find out and order some method for the payments of Boltwood's expenses upon the mill, tha the mill farm and other lands given to the school may return to that public use ; the president and council hereby declaring it to be beyond the power of the town of Hadley, or any other, to divest any of the lands or estate, or the said mill stream or privileges thereof, (which are legally determined to this said grammar school,) to any other use whatsoever ; the president and council judging the particular gifts in that town a good foundation for a grammar school, both for themselves and *the whole county* ; and that the grammar school can be no otherwise interpreted, but to be a school holden by a master capable to instruct children and fit them for the university.    Council House, Boston, December 6, 1686."

They further state, that at a county court held at Northampton on June 8, 1687, an order was made, (which is set out at length in the answer,) reciting the proceedings of the president and council, and of the county court held at Springfield in September, 1686, and that the court held at Northampton approves of the same, and concluding as follows ; " It is therefore hereby ordered, that those persons of Hadley who have any ways meddled or intrenched upon the school estate thereof, which ought to be managed by John Russell, Aaron Cook, Joseph Kellogg and Samuel Porter, the feoffees of said school, (to whom this court of sessions, according to orders, have now by the consent and choice of the rest of the committee added Chiliab Smith of Hadley, to make up the number of five feoffees,) do deliver up all the estate they have entered on, forthwith, into the hands and ordering of the feoffees, on penalty of all damage that may come to themselves by neglect thereof."    And the defendants therefore allege, that as, from their obvious nature, the donations were, and by the judgment of the president and council, and of the court held at Northampton, they were adjudged to be, "a good foundation for a grammar school, both for themselves and *the whole county*," and as it was further adjudged, " that a grammar school can be no otherwise interpreted but to be a school

holden by a master capable to instruct children and fit them for the university," the plaintiffs should not now be allowed to claim that the committee, or those who have succeeded them in the trust in question, should apply the trust fund exclusively to the use of the inhabitants of Hadley.

The defendants admit that an act of the legislature was passed on June 14, 1816, (*St.* 1815, *c.* 104,) to incorporate the trustees of Hopkins academy, by which it is provided, that there shall be established an academy in the town of Hadley upon the foundation of Hopkins donation school, and that the committee of the school be incorporated into a body politic by the name of The Trustees of Hopkins Academy ; and that all the lands and moneys heretofore given or subscribed to the committee for the use of the school, or which shall be hereafter given, granted and assigned to the trustees for the use of the academy, shall be confirmed to the trustees, and their successors in that trust, for ever, for the uses designated by the donors, and that they shall be further capable of taking and holding estate, real or personal, provided the annual income of the same shall not exceed 5000 dollars, and that the rents and profits thereof shall be applied in such a manner as that the designs of the donors may be most effectually promoted. And the defendants aver, that this act was procured upon the petition of the committee of the donation school, acting in concurrence with the town, pursuant to a vote of January 1, 1816, " that the town will unite with the committee of the donation school in petitioning the legislature for the establishment of an academy in this town." And the defendants represent, that the town, in thus uniting with the committee, intended that all the funds in the hands of the committee should be thereafter applied to maintaining an academy in the town, upon the footing and system of other academies in New England ; and that in consequence of the town's concurrence with the committee in obtaining the act of incorporation, donations had been made by the legislature and by individuals, for the general purposes of an academy, and it would be a fraud upon such donors, if the town should now withdraw all the funds of the donation school and appropriate them to the exclusive use of the inhabitants of Hadley.

Hadley<br>v.<br>Hopkins<br>Academy.

Hadley
v.
Hopkins
Academy.

They further allege, that the trustees of Hopkins academy established a grammar school in Hadley, and have from time to time furnished the best instruction their ability permitted, in Latin, Greek, astronomy, ancient and modern history, logic, ancient and modern geography, natural, moral and intellectual philosophy, rhetoric, geometry, chemistry, arithmetic, composition, reading, declamation, and such other studies as are usually taught in academies ; that to this school every person in Hadley, of proper age and qualifications to receive benefit from the school, could be admitted, and none such have ever been refused ; that the trustees have supposed it to be their duty to have, at all times, a master capable to instruct children and fit them for our university or some of our colleges ; that the expense of such instruction has at all times more than exhausted the whole annual income of the funds in the hands of the trustees, and the balance of the expenses has been assessed on the scholars as tuition fees ; that it is true the school has been resorted to by youth from other towns, but this has not only in no way been detrimental, but, on the contrary, has been highly beneficial, inasmuch as the excess of expenses of instruction over the income of these funds, instead of being assessed wholly upon the scholars who are inhabitants of Hadley, has been apportioned among all the scholars, while the opportunities for instruction have been in no degree lessened.

In an amended bill the plaintiffs allege, that no record is to be found of any such judgment of the president and council of New England, as is stated in the answer of the defendants, but that, from writings which have been preserved, it appears that there was a controversy between the town of Hadley and the committee above mentioned, upon the point whether the town had a right to take into their hands and management the property mentioned in the original bill, and appropriate the proceeds to the support of a common school in Hadley, but that the point whether the committee were bound to administer the funds and appropriate the avails for the support of a grammar school for the exclusive use of the town, was not drawn in question, nor was the town heard thereon ; that the declaration of the president and council, that the donations were a good foundation for a grammar school for the whole county,

was extrajudicial and not authorized by the issue before them ; that at the time of the several donations mentioned in the original bill, the town of Hadley embraced the territory which now constitutes, besides the present town of Hadley, the towns of Amherst, South Hadley, Granby, Hatfield, Williamsburgh and Whateley, and that some individuals in these towns might have claimed that the donations were to be appropriated for the common benefit of all these towns, and that under such impressions students from these towns might have occasionally attended the school ; that the town of Hadley has by no act whatever recognised the right of the committee or trustees to admit into the school or academy students from any other place than Hadley, and that, as the plaintiffs believe, prior to the act of incorporation, no students, except from the towns above mentioned, ever attended the school under a claim of right ; that the plaintiffs voted to concur with the committee in an application to the legislature for an act of incorporation, in the belief that the funds could be better managed by a corporation than by a committee, but without any intention of surrendering their right to the exclusive use and benefit thereof, and that the act was cautiously framed with a view to secure the exclusive right of the town.

In their answer to the amended bill, the defendants state, that there cannot be found at Boston, any record of the judgment of the president and council, and the reason is, because there is a loss of the public records of the general court, and also of the council records, during the period from May, 1686, to 1689, when the affairs of the province were managed by a president and council ; but that full transcripts of records of the proceedings stated in their former answer, are found in an ancient book purporting to be records of the county court of pleas and sessions holden at Northampton for Hampshire, for June, 1687, and also in an ancient book of records kept by the donation committee, purporting to contain an account of the various donations for the school, and of the various judgments of the president and council, and of the county courts of Hampshire, respecting the same ; that they have no knowledge that some of the inhabitants of the other towns formerly constituting a part of Hadley claimed a common right in these

Hadley
*v.*
Hopkins
Academy.

funds, any further than appears from their previous answer that in admitting students they have not confined themselves to the limits of Hampshire, in its former extent, but have adopted as their guide the will of Edward Hopkins, which expresses the object of his donation, in the manner before stated ; and that the question of the school being a public school for others than those residing in Hadley, must have been in controversy between the town and the committee before the president and council, at the time of making the adjudication declaring it a public school, as set forth in the former answer.

The plaintiffs filed a general replication.

*Sept 23d.*      At the hearing the defendants read several depositions, and introduced a book of records of the county court, reciting the proceedings of the president and council, and containing the adjudication of the county court thereon, as set forth in the pleadings ; also a certificate of the secretary of the commonwealth, that there are no records of the proceedings of the  · council from May, 1686, to 1689.

*Billings* and *Forbes* argued in support of the bill in regard to the jurisdiction of the president and council, they referred to Ancient Charters &c. 52, 90, 93 ; and to the point, that. the proceedings of the president and council were not conclusive against the plaintiffs, *Smith* v. *Sherwood*, 4 Connect. R. 277 ; 1 Stark. Evid. (Metcalf's edit.) 198 ; *Foster* v. *Jackson*, Hob. 53 ; Bul. N. P. 233 ; *Spooner* v. *Davis*, 7 Pick 147, and authorities there cited.

*Bates* and *Dewey*, for the defendants, cited, in regard to the powers of the president and council, and of the county courts, 1 Belkn. Hist. N. Hamp. 184 *et seq.* ; 1 Chalmers's Annals, 417 ; Ancient Charters &c. 52, 92, 93, 94 ; 4 Dane's Ahr. 243 ; 6 Dane's Abr. 400, 401, 402 ; and as to the effect of usage on the interpretation of ancient grants, *Attorney General* v. *Parker*, 3 Atk. 577.

The opinion of the Court was afterwards drawn up by

SHAW C. J.  In order to understand the true grounds of controversy in the present case, it may be useful, before coming to a direct consideration of the point in controversy, to consider what the question is, and to distinguish it from others which may be considered as connected with it

In the first place, no question is made of the legal title of the defendants, to the real and personal property held by them ; and it is very clear that no such question could be made in this Court, as a court of equity. Questions of legal title are to be tried elsewhere. We are not called upon to consider an obvious difficulty, which might have presented itself, before the act of incorporation, in establishing a legal seisin in the donation committee, not being a corporation, and having no capacity to take and hold real estate in succession. Probably, however, they must have been considered at least as in actual possession by taking the rents, and such possession would have been considered as sufficient against all the world except those who could have set up a better title.

It is a rule in equity, that a gift of real or personal estate, either *inter vivos*, or by will, to promote education, is a charity. It is also considered as a settled rule, that such a gift to a charitable use is to receive a most liberal construction ; and if the trustees pervert the fund to other uses, or even if they refuse to accept or execute the trusts, the charity itself shall not fail, nor will the property revert to the donor. But it will be competent for a court of chancery to direct, in the former case, that the trusts shall be executed, and in the latter, that new trustees shall be appointed, in whom the legal estate shall vest, to be holden in trust for the purposes of the charity. It is quite clear, therefore, that even if the donation committee, prior to the act of incorporation, had met with a technical difficulty in maintaining their legal title, no forfeiture and no reversionary interest therein, could have been claimed by the heirs of the donors, could they still have been traced ; and therefore, as the lands and estate must still have been holden for the purposes of the trust, it would have been very immaterial, whether the legal estate should be considered as vested in the particular individuals, composing the donation committee, or not. That technical difficulty, however, was removed by the act of incorporation, passed with the consent and indeed upon the application of the committee, whereby they were made capable in law of taking and holding the legal estate in succession.

Another question which has been alluded to may be con-

sidered, for the purpose of being laid out of the case. It was stated in the argument for the plaintiffs, that the defendants, by introducing the higher branches of science into the academy, have changed the character of the institution from that of a school, to that of a college, whereby the inhabitants of Hadley are deprived of the benefits intended to be conferred on them by the maintenance of a grammar school. This complaint at first seemed plausible ; but we think it has no place in the present inquiry. It was not set forth in the bill, as a breach of trust ; it was advanced only in argument, and that argument was founded upon a statement in the defendant's answer, of the studies pursued at the academy. But as a distinct complaint of a breach of trust, it has not been made in the bill, nor have the defendants had opportunity to answer to it. The point might have some influence as an argument upon the other question which is afterwards to be considered, if it could be shown that such a school as the present is, was not the grammar school contemplated by the donor. For instance, if it were shown *aliunde*, that the school was intended exclusively for the inhabitants of Hadley, it might perhaps be argued, that the inhabitants had no need of an institution of so high a character, and therefore, that such an institution was not intended. But till that question is settled, the argument bears with the same force the other way. If the donors, by a grammar school, contemplated an institution of higher character, than is ordinarily required for the children of a single town, then it could not be intended by the donors, that the benefits of such school should be confined to the children of the inhabitants of Hadley. It can therefore have no weight, as an argument upon that question.

But the real question raised and discussed in the present case is, whether the funds placed under the control of the defendants, for the support of a school, are so to be administered, as to confine the benefit of them exclusively to the inhabitants of the town of Hadley.

By the terms of the act of incorporation, *St.* 1815, *c.* 104, § 2, all lands and moneys given to the committee for the use of said school, shall be confirmed to the trustees of Hopkins academy, and their successors in said trust for ever, *for the uses designated by the donors.*

The same trusts, therefore, under which the committee held the funds, prior to the act of incorporation, are those under which the defendants as trustees of the academy are still to hold them and appropriate them, so that the question, in this respect, is the same as if there had been no act of incorporation.

Two sources of evidence are relied upon by the defendants, to show, that they have heretofore rightfully administered these funds, as a trust for a public school, not confining the benefits of them to the town of Hadley, but communicating them equally to youth of other towns, who may desire the benefits of them.

1. The terms under which the grants were originally made, the will of Edward Hopkins, and the appointment made under it by his surviving executors, Davenport and Goodwin.

2. Certain judicial proceedings, which are alleged to have taken place before the county court for the county of Hampshire, and before the president and council of New England, about the year 1686, in which this very question was raised and determined against the claim and pretensions of the town of Hadley.

And they insist that these grounds are strengthened by an immemorial usage, acted upon by the trustees of the school called the committee of the donation school, and acquiesced in by the inhabitants of Hadley, which was, not to confine the benefits of the school exclusively to Hadley, but to admit pupils from other towns seeking the benefit of the school, in fitting for college.

These grounds are denied by the plaintiffs, who insist that the construction of the original instruments by which the donations were made, will lead to a contrary conclusion ; that the judicial proceedings were not well proved, or if they were, that the court had no jurisdiction ; and that there has been no usage to admit pupils from other towns so general or so notorious, as to raise an implication that it was acquiesced in by the inhabitants of Hadley.

To trace the foundation of this school, we are carried back through an interval of nearly two centuries. The clause in the will of Edward Hopkins, the liberal benefactor of New

Hadley
*v.*
Hopkins
Academy.

England, recited in the bill and admitted in the answer is to this effect. " And the residue of my estate there," &c. (as before, *p.* 241).

This is a devise to the trustees by which the real and personal property became vested in them, on the trusts designated, indicating certain objects to be accomplished, and entrusting them with full power to specify those objects, and execute the purposes intended by the will, according to their discretion and their views of his known wishes, and his "true intent and purpose." In 1664, Davenport and Goodwin, the two surviving trustees, proceeded to execute the trust and power reposed in them, by an appointment of the particular uses of this property, by an instrument, under their hands and seals, (*vid. ante*, p. 241, 244).

Had this instrument contained only that provision, which is extracted and set forth in the bill, directing that the property shall be equally divided between New Haven and Hadley, to be in each of those towns managed and improved towards the erecting of a grammar school in each of those towns, taking the views that we have derived from later experience, by which we consider towns, in all respects, as strict corporations, there would have been ground for contending that the gift and appointment was to the town of Hadley, in its corporate capacity. But in that case it would have been open to contend, that the legal estate was to Hadley, as a corporation capable of taking and holding property for the use of a school. But the subsequent provision, appointing trustees and vesting the legal estate in them, expressly negatives this hypothesis, and shows that the legal estate was not vested in the town, nor does it appear that the town have claimed to be the holders of the legal estate, since the attempt to take the management of it into their own hands in 1686. Besides, at the period of these conveyances, towns in Massachusetts were not considered so fully corporations as they have since been, but their corporate powers have been increased from time to time by particular legislative enactments. But it is believed, that the name, by which a township or settlement was designated, was as often used to express the idea of place, as to describe the body of inhabitants or settlers, in their municipal corporate capacity When therefore the

phraseology is, that the money shall be equally divided between Hadley and New Haven, and then in the same instrument trustees are appointed to hold and manage it, it seems to import nothing more than to direct that it shall be apportioned equally to the institutions to be established at the two places respectively. We must therefore resort to other considerations to determine the question in controversy.

In doing this, it is necessary to look carefully at both instruments, the devise to the trustees, and the appointment and settlement by them, and to consider both in reference to the state and condition of the colony at that time. The purpose of the pious donor was, as he modestly expressed it, "to give some encouragement, in these foreign plantations, for the breeding up of hopeful youth in a way of learning, both at the grammar school and college, for the public service of the country in future times." This looks not only to great objects and useful objects, but to public objects. The establishment of the grammar school, is coupled immediately with that of the college, which, although it must necessarily be established in some place, and so is local in its existence, yet is necessarily public and general in its purposes. The end contemplated was the public service of the country in future times. It was to breed up hopeful youth in a way of learning. These expressions seem inconsistent with the purpose of establishing a local school for teaching the humblest rudiments of education to the children of both sexes, who usually resort to such a school. If it be said that these expressions are adapted to that part of the provision, which points to the encouragement to be given to the college, the answer is obvious, that both are included in precisely the same terms. It seems much more like having regard to a course of liberal education and the fitting of men with that degree of learning which might qualify them for public service as professional men, especially for the service of the church. In that view the two leading objects are perfectly consistent, and calculated to advance each other ; supposing a grammar school designed to fit young men for college, and the college, to enable them to complete a liberal education, preparatory to public or professional life He afterwards with much solemnity and earnestness speaks of the

22 *

Hadley
v.
Hopkins
Academy
aforesaid *public ends*. This looks little like a design to found a local school, confined in its benefits to the children of a single settlement.

And we are of opinion, that the original trustees of Mr. Hopkins, who were specially charged with the execution of the liberal and beneficent designs of the donor, understood it in the same way, by the instrument which they executed.

After performing that part of their duty which consisted in providing for the college, they proceed to execute their powers in regard to the schools. They direct the property to be divided equally between New Haven and Hadley, to be *in* each of the towns managed, and improved towards maintaining a grammar school in each of them, and they direct in whose hands the management thereof shall be ; and as to Hadley, this management is committed to four trustees specially named, with power to appoint successors and fill vacancies, and their powers are to extend both to " the ordering of said estate, and carrying on the work wherein it is to be employed," with full power to pursue and put in execution the pious end and intendment of the worthy donor, that is, to be trustees of the estate, and directors or managers for the establishment, maintenance and regulation of the school. This object was further secured, as far as it was in their power to secure it, by reserving to themselves, whilst they lived, the full power of a negative vote, for the hindering any thing that might cross that end. In this appointment, the trustees of Mr. Hopkins seem to have done little more, in the execution of their powers, than to apportion the amount of property to be appropriated to this school, fix the place where it should be established, designate the persons who should hold the property and manage the school, and provide for perpetuating them. But as to the great object to be kept in view, in administering this trust, they referred to the objects expressed by the donor. In considering those objects, we can perceive nothing which looks like a restraint upon the permanent board of trustees, obliging them to consider the trust as intended exclusively for the benefit of the inhabitants of Hadley. It is incumbent on the plaintiffs to show that they are exclusively entitled to the benefit of this trust, and if that is not shown, they must fail in es-

Hadley
v.
Hopkins
Academy.

taolishing this claim. There is nothing, either in the original will, or in the appointment under it, to indicate that such an exclusive right was intended ; but on the contrary, we think it more consistent with the avowed intention of the testator, to conclude that it was designed for the encouragement of all those, in that newly settled part of the country, who were desirous of availing themselves of the benefit of a grammar school, to qualify them for the university. The mere circumstance of being fixed in Hadley, has no tendency to show, that any other exclusive or peculiar benefit was intended, than that which arises incidentally to any place, from having a public school in its immediate vicinity.

Nor can we perceive that the trusts and purposes of this appointment are varied by the proposal, subsequently made to the town by Mr. Goodwin, one of the surviving trustees, in 1669, to which the town acceded.

Whether the property had been actually placed in the possession or under the control of the trustees named in the deed of appointment, does not distinctly appear ; nor does it appear what occasion there was for any new arrangement. One purpose perhaps may be safely conjectured, that of connecting two or three other donations, made for the support of a school, and one by the town itself, with that of Mr. Hopkins, so as to place the whole under one administration, and appropriate the whole to one object. The proposal made by Mr. Goodwin was substantially this ; that he should appoint three persons, to be submitted to the town and be approved by them, that the town should appoint two, and that these five, with himself whilst he lived, should have the sole disposal and management of the estate in all respects, *for the end to which it was bequeathed* ; and the same five persons, with himself whilst he lived, were to have the sole management of all other estate given by any donor, or which might be given while they survived, to the town of Hadley, for the promotion of literature or learning. These trustees were appointed for their lives, with power to perpetuate the board by filling their own vacancies. And Mr. Goodwin modestly requested that it might be called the Hopkins school. This proposal being submitted to the town, they voted to send to Mr. Goodwin to

Hadley
v.
Hopkins
Academy.

know the persons he would make choice of, and he names three, two of whom appear to be the same, who had been named in the deed of appointment. These are approved by the town, who elect two on their part conformably to the proposal, one of whom, Mr. Tilton, appears to be the same with one named in the deed of appointment. These acts, done in pursuance of Mr. Goodwin's proposal, seem to be a distinct acquiescence and concurrence in that proposal. But some reliance, and indeed the principal reliance, seems to be placed by the plaintiffs, upon the terms of the vote passed on that occasion by the town. It was in substance, that the committee thus chosen should jointly and together have the ordering and full disposal of the estate given by Mr. Davenport and Mr. Goodwin, as trustees of Mr. Hopkins, *to the town of Hadley*, or any other estate or estates that were or might be given either by the town itself, or any other donor or donors, for the use, benefit and maintenance, and promoting a grammar school, *to and for the use and in the town* of Hadley.

They also state, that the trustees shall supply vacancies in their own body, by the choice of other persons, so that they be known discreet, pious, faithful persons ; and they direct two persons named to present the premises to the court to be recorded.

It appears to us, that these proceedings did not in any degree change the nature of the trusts upon which the property was to be held ; it merely changed, in a slight degree, the organization of the board of trustees, so as to give the town an effectual agency in its constitution, by which they had the exclusive nomination and appointment of two, and a negative upon Mr. Goodwin's nomination of the other three. It substantially placed the control of the whole, under the agency of the appointees of the town. The town might therefore well consent, that their own, and the other small donations for the like object, should be placed under the same government.

They chose to speak of the property given by Mr. Goodwin and Mr. Davenport, under Mr. Hopkins's will, as property given to the town of Hadley. If they meant given to the town in its corporate capacity, we have already shown that it was not so given, but to trustees to establish a school in

Hadley.   And the other clause, *to and for the use of the town* of Hadley, is so introduced, as to leave it doubtful, whether it was intended to intimate their views of the purpose, to which the funds were to be appropriated, or to be descriptive of the other estate, which might be given by the town itself, or by any other donor.   But what renders it quite certain, that it was not intended to declare any other or different trust, from that already declared by Goodwin and Davenport, is this ; that Mr. Goodwin's proposal was, that the committee should hold the property, in all respects, for the end to which it was bequeathed by Mr. Hopkins ; and that the town intended to accede to this proposal, and not to change or qualify it, or make a new one, is manifest from this, that they did not submit this vote of theirs to Mr. Goodwin, for his concurrence, as they would, if they had proposed a change or modification of his proposal ; but, on the contrary, they directed the proceedings to be presented to the court, probably the county court, to be recorded, as a complete and settled arrangement. Besides, when it is considered how peculiarly a grammar school, permanently fixed in any town, enures practically to the use of such town, and when by this arrangement the school was permanently established in Hadley, and was placed under the control and management of a board of trustees, in the appointment of whom the town had a direct participation, and who, by the mode of perpetuation, might generally be expected to be inhabitants of that town, it was not very wide from the truth to describe it as a school to be for the use of, as well as established in the town of Hadley.   But there are no words of exclusion or limitation, and no intimation that the beneficial use was to be confined exclusively to the inhabitants of Hadley.   We think therefore that there is nothing in these proceedings, which was intended to vary, or, if so intended, which could legally vary, the trusts, upon which the property in question was conveyed to, and vested in the committee thus appointed.

In regard to the other donations set forth in the bill, it appears to us that they clearly follow the principal one, derived from Hopkins.

The devises by Barnard and by Ward were both made in

1664, the same year that the deed of appointment was made by the trustees of Hopkins, and the object being the same, the establishment of a grammar school, the intent to give it the same destination might be presumed. But it does not stand on this presumption. By vote of the town in 1669, it was decided by the town, that all estate which had been given, or might be given for the same purpose, should be held and managed by the same committee ; which is, in effect, a declaration, that they shall be held upon the same trusts, and appropriated to the same purposes. And even if it were a question of legal title, it is to be recollected, that in transactions of this antiquity, a conveyance by vote, by a corporation, is held sufficient to vest an estate, and pass the fee. *A fortiori*, is it good, as the manifestation of a trust.

That portion of this estate appropriated by the town itself, was thus done in 1666, before the above agreement. It was not strictly a grant, because there was no grantee. It was rather an appropriation, then made, and vested in the committee by the subsequent vote of 1669, subject to the same trust. So much are charities of this sort favored, that where the grantee in trust for education, is not in *esse*, as in the case of a grant to a body not yet incorporated, but afterwards a corporation or a board of trustees is created, chancery will uphold the trust and carry the object into effect, by directing the necessary conveyances, and settling the proper trusts.

Here the town did voluntarily, and by its own act, all that was necessary to give the grant effect, by designating the grantees and vesting the estate in them, by vote.

The grant of Henry Clark was after the vote of 1669, to wit, in 1675. But it is to be observed, that although by the terms of Henry Clark's will, he gives the estate to the town of Hadley, yet it is under this limitation ; committing the same to the care, disposing and ordering of Lieut. Samuel Smith, &c., (naming the Hopkins committee,) to be by them disposed of, to Hopkins school, for Hadley, with an express condition, that if they are disturbed in their committeeship, it shall be otherwise disposed of as they shall see meet, for the good of the town.

It might be difficult perhaps to put a legal construction upon

this devise, so as to determine whether the fee vested in the committee or the town. But as already shown, that question is not now before the Court   One thing is perfectly clear, that is, that the trust of this devise was for Hopkins school. Whatever were the purposes of that school, the same were those of this gift. It must clearly therefore follow the same trusts, which had already been declared as those upon which this school was founded by Hopkins, and those who were entrusted by him with the power of giving a specific form to his declared purpose of promoting a public grammar school.

The second principal ground, on which the respondents rely, to show that these funds were not held exclusively for the benefit of the inhabitants of Hadley, is, the acts and adjudication of the county court and of the president and council of his Majesty's territory and dominion of New England, which are set out in the answer.

Two objections are taken to these proceedings, by the plaintiffs in this case ; one is, that they are not duly authenticated ; and the other is, that neither the county court, nor the president and council, had any jurisdiction of the subject matter, and that their proceedings therefore, ought not to be considered as having any legal effect. We have not thought it necessary to examine either of these questions very strictly, for reasons which will be sufficiently manifest. These transactions connect themselves with one of the most remarkable periods in the history of Massachusetts. The proceedings, so far as we have evidence of them, were before the president and council of New England in the autumn of 1686, very shortly before the arrival of Governor Andros. We have a certificate from the secretary's office, stating that there are no records of the proceedings of the council from May, 1686, to 1689. It will not be difficult for those who are conversant with the history of that disturbed period, to account for the entire absence of those records. The commission of Governor Dudley as first president, was received on the 15th of May, 1686, and he was superseded by the arrival of Sir Edmund Andros in December of the same year. By him and his council all the affairs of the colony were managed, until 1689, when he was arrested, and forcibly put out of the gov

ernment. It was the manifest policy of those who thus forcibly superseded him, and who were in truth the champions of the chartered rights of the colonies, to leave as few traces as possible, of the arbitrary, and, as they believed, tyrannical proceedings of this president and his council. Still it was a government *de facto*, and as such, acts done within its jurisdiction, would probably be binding. From the imperfect view, which alone can now be obtained of these proceedings, it cannot be certainly determined how the case of this school was brought before the president and council. The county court, under the colonial government, had an extensive and perhaps not very strictly defined jurisdiction ; it extended to matters of criminal, civil and probate jurisdiction. Ancient Charters &c. 91. And it is expressly ordained, that all persons "betrusted to receive or improve" any gift or legacy "given and bequeathed to the college, schools of learning or any other public use, shall be liable from time to time to give account of their disposal and management thereof to the county court of that shire where they dwell, and where such estate shall be, and to appoint feoffees of trust, to settle and manage the same according to the will of the donors." Ancient Charters &c. 52.

Under the charter, the general court was deemed and declared to be the chief civil power in this commonwealth, with authority to act in all affairs according to such power, both in matters of counsel, making of laws, and matters of *judicature*. Ancient Charters &c. 88.

By an ordinance in 1654, in consequence of the general court being so much oppressed with the weight of business, it was ordered, that causes properly cognizable by the county court, should not be transferred to the general court, but that difficult cases might be presented by inferior courts for its opinion. Ancient Charters &c. 92.

After the dissolution of the colony charter in 1685, and the establishment of the royal government, it was provided in the king's commission, first to Dudley, and afterwards to Andros, which commissions, together with the royal instructions, constituted the basis of that government, that all former ordinances should remain in force, and that the president and council should have and exercise the same powers, which had formerly been exercised by the government under the colony charter.

From this general view, it would seem, that the jurisdiction, both of the county court and of the president and council, was amply sufficient to embrace a case like this.

It appears that the county court did in fact exercise a superintending authority over cases of this kind, because there is a record showing that as early as 1682 the committee of the Hopkins school presented a report of their proceedings to the county court, which was accepted and allowed. The court also take notice who are trustees, and confirm and approve of them, and desire and expect their further management, in carrying on the affairs of said school, which the court will be always ready to promote and encourage as need may require.

It is also to be recollected, that upon the final adjustment of this trust, by the proposal of Mr. Goodwin and the votes of the town in 1669, the town ordered the proceedings to be presented to the county court to be recorded, thereby recognising their jurisdiction of public trusts of this kind, and confirming the conclusion that it was a public trust. But the judicial proceedings relied upon, commenced at a later period. It appears that in August 1686, the town of Hadley passed a vote, to take into their own hands, to manage, order and dispose, to the use of a school &c., all estates bequeathed &c., as the legacies of Ward, Barnard and Clark. It is to be remarked, that by this vote, they did not seem to claim the property of Hopkins, except in general terms. In consequence of this vote, in September of the same year, proceedings were commenced in the county court at Springfield, by the committee, who presented the declining state of the school in Hadley, for that some of Hadley do disturb or obstruct the management of the estate of said school. Upon this the court passed an order, that all the gifts to that object should be improved by that committee.

It does not appear how proceedings were instituted before the president and council, whether by reference from the county court, or by an original application. A decision however seems to have been made, December 6, 1686, which was afterwards laid before the county court, and by that court fully adopted and affirmed.

But we do not think it necessary to refer to these proceedings at large.   We have looked into them only so far as to see that they do not militate against the opinions which we have formed, upon the effect of the original grants and the trusts upon which they were made.   On the contrary, the effect of the decisions, both of the county court and of the president and council, was, that the committee be and remain feoffees of the school, judging the particular gifts in that town, a good foundation for a grammar school, both for themselves and for the whole *county*, and that a grammar school could be no otherwise interpreted, but to be a school holden by a master capable to instruct children and fit them for the university.   This adjudication was adopted and measures taken to carry it into effect, by the county court.   We should not be surprised to find, if the early manuscript could be obtained, that the word written *county* was *country ;* it being more consonant with the true nature of the trust, contemplated by Hopkins, and because the term " country " was then generally adopted to express the public or the whole community.   But in either form, it negatives the claim of the town of Hadley to the exclusive benefit of these funds.

Had these adjudications been the other way, or had the claim of the respondents rested solely upon them, it would have been necessary to examine with a more rigid scrutiny, both the authenticity of the documents, in which these proceedings are now found, and the jurisdiction of the courts, over the subject matter, and over the particular question of the trusts, on which the donations were made, all these points being controverted by the plaintiffs.   But as we have already stated, we have only looked into them so far, as to see that they do not militate against the decision to which we have now come, upon other grounds.   As the case of the defendants does not rest solely, or principally, upon these adjudications, as their case is established independently of them, it would not vary the result, if the objections made to their authority and sufficiency by the plaintiffs should be fully sustained.

3. The last ground upon which the defendants rely, is the usage and practice of the trustees or donation committee, from 1686 to the present time.

Usage, especially in ancient transactions, is a good contemporaneous construction of a doubtful grant.

In looking at the evidence adduced upon this point, nothing is found in the records of the trustees to show whether they did, or did not, confine the benefits of this grammar school, to children of the inhabitants of Hadley. The evidence therefore must rest upon living memory, which extends back fifty or sixty years ; and by this it appears most satisfactorily, that in point of fact, although practically it has enured principally to the use of the inhabitants, yet it has not been confined to them, but many boys from other towns have been fitted for college there ; and those who have been longest conversant with the actual management of the school as trustees, testify that they have always considered it as a school, the benefits of which have not been confined, and of right were not to be confined, exclusively to children of the inhabitants of Hadley.

Perhaps some of the minor questions made in this case may have been passed over without notice. We have endeavoured to consider the general question upon its merits, and upon the broadest principles ; and upon the whole matter we are of opinion, that the inhabitants of the town of Hadley are not exclusively entitled to the benefits of these ancient donations, that the defendants in their mode of administering them, and extending the benefit of them to children of other towns, have not been guilty of the oreach of trust charged in the bill, and therefore that the suit must be dismissed.