### STUART v. CITY OF EASTON et al.

(Circuit Court of Appeals, Third Circuit. June 4, 1896.)

#### No. 18.

1. GIFT FOR CHARITABLE USE—REVERTER—NONUSER.

A grant of land by the proprietaries of Pennsylvania, "in consideration of the yearly quitrent (one red rose) hereinafter reserved, and of the sum of five shillings," to persons named, and "their heirs and assigns, forever, in trust, nevertheless," for a certain charitable use, "and for no other use, intent, or purpose whatsoever," is not defeated by nonuser, in the absence of any express provision for a forfeiture or reverter.

2. SAME—WHAT IS CHARITABLE USE.

A grant of lands by the proprietaries of Pennsylvania, in trust "for the erecting thereon a courthouse for the public use and service" of a county, was a gift for a charitable use.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

C. Berkeley Taylor and A. S. Freedley, for plaintiff in error.

Aaron Goldsmith and Edward J. Fox, for defendants in error.

Before SHIRAS, Circuit Justice, ACHESON, Circuit Judge, and BUTLER, District Judge.

ACHESON, Circuit Judge. This was an action of ejectment by William Dugald Stuart, an alien and subject of the queen of

Great Britain, against the city of Easton and county of Northampton, corporations of the state of Pennsylvania.

The county of Northampton was laid out and erected by an act of the general assembly of the province of Pennsylvania passed the 11th day of March, 1752. 1 Dall. Laws, 452. The sixth section of the act provided as follows:

"And be it further enacted, that it shall and may be lawful to and for Thomas Craig, Hugh Wilson, John Jones, Thomas Armstrong, and James Martin, or any three of them, to purchase and take assurance to them and their heirs, of a piece of land situate in some convenient place in the said town [Easton], in trust and for the use of the inhabitants of the said county, and thereon to erect and build a court-house and prison, sufficient to accommodate the public service of the said county and for the ease and conveniency of the inhabitants."

On the 9th day of July, 1762, Thomas and Richard Penn, the proprietaries of Pennsylvania, caused to be issued a warrant of survey, which, after reciting the above-mentioned act, proceeded thus:

"And whereas, on application and request of said trustees, and out of regard to encourage and promote the improvement of the said town, and general good and convenience of the inhabitants of the said county, we have condescended and agreed to grant to the said trustees a lot or piece of ground, of eighty feet square, to be laid out in the center of the great square in the middle of the said town of Easton, for a courthouse for the use and the accommodation of the inhabitants of the said town and county forever."

And the warrant then directed the surveyor general to survey and lay out the said described lot of ground "for the public use of a courthouse for the inhabitants of the said town and county."

This warrant having been duly executed and returned into the land office, a patent was issued on the 28th day of September, 1764, by the proprietaries, to the named trustees for said lot. After reciting the act of assembly and the warrant of survey, the patent proceeds thus:

"Now, know ye, that for the further encouragement and better promoting the public benefit and service of the said town and county, and for and in consideration of the yearly quitrent (one red rose) hereinafter reserved, and of the sum of five shillings to us in hand paid by the said trustees, the receipt whereof is hereby acknowledged, we have given, granted, released, and confirmed, and by these presents do give, grant, release, and confirm, unto the said trustees, John Jones, Thomas Armstrong, James Martin, John Rinker, and Henry Allshouse, and their heirs, the said lot of ground, situate in the center of the great square in the said town of Easton, containing eighty feet in length, north and south, and eighty feet in breadth, east and west. * * * To have and to hold the said hereinbefore described lot of ground, with the appurtenances, unto the said John Jones, Thomas Armstrong, James Martin, John Rinker, and Henry Allshouse, their heirs and assigns, forever; in trust, nevertheless, to and for the erecting thereon a courthouse for the public use and service of the said county, and to and for no other use, intent, or purpose whatsoever."

By virtue of an act of assembly approved April 15, 1834 (P. L. p. 538), the title of the trustees became vested in the county of Northampton. The Northampton county courthouse was erected upon the said lot of ground between the years 1763 and 1766, and remained upon the lot from that time until 1862, in which year it was removed, and no other buildings have been erected thereon

since. On the 25th day of July, 1888, William Stuart, who was the heir at law of Thomas and Richard Penn, caused an entry to be made on the said lot of ground for breach of the condition subject to which, it is alleged, the lot was granted by the above-recited patent, and subsequently he brought this action of ejectment for the recovery of the lot. William Stuart having died after the commencement of the suit, his son, William Dugald Stuart, who succeeded to all the rights of the said William Stuart in and to lands in Pennsylvania, was substituted as plaintiff. Under the instructions of the court below, there was a verdict for the defendants, and afterwards judgment was entered in their favor.

The position taken by the plaintiff in error is that the grant of September 28, 1764, by Thomas and Richard Penn to John Jones and others, "their heirs and assigns, forever; in trust, nevertheless, to and for the erecting thereon a courthouse for the public use and service of the said county, and to and for no other use, intent, or purpose whatsoever," did not pass an estate in fee simple, but only a conditional estate, determinable on the cessation of the use of the lot of ground for the designated purpose. Is this a sound view of the conveyance?

It is to be observed that the deed from the Penns recites as the occasion of the grant the act of the general assembly under which, as we have seen, John Jones and others were empowered "to purchase and take assurance to them and their heirs" of a piece of land "in trust and for the use of the inhabitants of the said county," and thereon to erect a courthouse "for the ease and conveniency of the inhabitants." Undoubtedly, the act of assembly contemplated the acquisition of an estate in fee simple only, by the appointed trustees. Now, the conveyance by the Penns is to the named persons, "their heirs and assigns, forever." The succeeding words, "in trust, nevertheless, to and for the erecting thereon a courthouse for the public use and service of the said county, and to and for no other use, intent, or purpose whatsoever," define the relation between the grantees and the inhabitants of the county of Northampton, and restrain the grantees from any other application of the property than to the avowed object of the grant. The words of the deed are apt words to pass a fee-simple estate as between the grantors and the grantees, and to create a trust as between the grantees and the beneficiaries. There is here no express provision for forfeiting the estate for nonuser, nor is any right of re-entry expressly reserved to the grantors or their heirs in the event of the cessation of the use of the lot for the designated purpose. The object of the grant was the public benefit and service of a growing community, throughout all future changes in the condition and circumstances of that community, and the purpose of the grant could be subserved best by the conveyance of an absolute estate. In the absence, then, of express stipulation, is it to be supposed that the grant of a conditional estate determinable by re-entry upon nonuser was intended?

In Wright v. Linn, 9 Pa. St. 433, where land was conveyed to certain named persons and their successors, in trust to erect a school-

house for the perpetual use of the parties to the deed, and other designated persons, it was held that a charity was created, which was not determined by nonuser for more than 17 years after a schoolhouse had been erected and used, and a re-entry by the grantor. In McKissick v. Pickle, 16 Pa. St. 140, 148, the court declared, "The grant, being for a charity, could not be forfeited for nonuser, nor for misuser, except under an express condition or contract;" and the court further said, "The law raises every intendment in favor of a charity against the grantor, or those claiming under him." In Griffiths v. Cope, 17 Pa. St. 96, 99, in construing a devise to charitable uses, the court said:

"Our law discourages the fettering of estates and putting them into mortmain, and therefore favors the construction which relieves from restraints upon alienation; and it seems unreasonable to suppose that a devisor ever means that his heirs shall get back the land in such cases, except when he says so. * * * It would seem contrary to public policy to favor a construction that would give to a man who died a hundred or a thousand years ago the control of land that ought to be controlled by the present generation. Such an intention ought to be expressed, not implied."

In Barr v. Weld, 24 Pa. St. 84, 87, where a conveyance was "in trust for the Utica schoolhouse," the court said:

"There is no express condition or contract giving to the grantor or his heirs the right to enter for condition broken, or for misuser. He had therefore no right to maintain an ejectment, and the plaintiff, claiming under him, is in the same predicament."

In Re Mercer Home for Disabled Clergymen, 162 Pa. St. 232, 238, 29 Atl. 731, where a testatrix devised a farm to a charitable use, as a home for disabled clergymen, and directed that no part thereof "shall be sold or disposed of, incumbered, or applied to any other use or purpose than as a home for disabled clergymen of the Presbyterian faith, as above specified," it was held that, as the testatrix created no remainder or reversion, the charity took an estate in fee simple; that the heirs of the testatrix had no interest, direct or remote, in the property; and that nothing short of a plain, unequivocal direction that no part of the land should be parted with for any purpose whatsoever ought to be held sufficient to restrain the managers from doing that which the interest of the charity under their control required of them.

These decisions of the supreme court of Pennsylvania are conclusive, we think, against the claim of the plaintiff in error, if, as is contended by the defendants, the grant by the Penns was for a charitable use. To the question, then, whether the use designated in and by the deed of September 28, 1764, is of a charitable nature, we now direct our attention.

Although the statute of 43 Eliz. c. 4, concerning charitable uses, was not adopted by the colony or state of Pennsylvania, still the principles of it, as applied by chancery in England, always have obtained here, by force of the common law of the state. Witman v. Lex, 17 Serg. & R. 88. This was clearly shown by Mr. Justice Baldwin, sitting at circuit in this state, in his learned opinion upon charitable uses in the case of Magill v. Brown, Brightly, N. P. 347, Fed. Cas. No. 8,952, which arose under the will of Sarah Zane, wherein also he

demonstrated that the whole course of the common law of England, except as modified for special purposes of policy by the statutes of mortmain and superstitious uses, was favorable to charities. And in Ould v. Hospital, 95 U. S. 303, 309, 311, the supreme court of the United States declared that the statute of 43 Eliz. c. 4, was purely remedial and ancillary, and that the validity of charitable endowments, and the jurisdiction of courts of equity over them, do not depend upon that statute. Now, in Jones v. Williams, Amb. 651, Lord Camden defined a charity to be "a gift to a general public use, which extends to the poor as well as to the rich," and a bequest of a fund to be applied to waterworks for the use of the inhabitants of a town was there recognized as for a charitable use. In Howse v. Chapman, 4 Ves. 542, 551, it was held that a bequest for the improvement of the city of Bath was a charitable bequest. In British Museum v. White, 2 Sim. & S. 595, a devise to the British Museum was adjudged to be for a charitable use. In Attorney General v. Heelis, Id. 67, 76, where a part of a common was dedicated for paving, lighting, cleansing, and otherwise improving a town, the funds derived therefrom were held to constitute a charity, and the vice chancellor (Sir John Leach) there said:

"I am of opinion that funds supplied from the gift of the crown, or from the gift of the legislature, or from private gift, for any legal public or general purpose, are charitable funds, to be administered by courts of equity. It is not material that the particular public or general purpose is not expressed in the statute of Elizabeth, all other legal public or general purposes being within the equity of that statute. Thus * * * a gift to build a sessions house for a county, a gift by parliament * * * for the purpose of rebuilding St. Paul's Church after the fire in London, have all been held to be charitable uses, within the equity of the statute of. Elizabeth."

These English cases are cited with approval in the opinion of the supreme court of Pennsylvania in Wright v. Linn, supra, and the deduction therefrom made "that every kind of legal public benefaction is included in the notion of charity." In Coggeshall v. Pelton, 7 Johns. Ch. 292, a pecuniary legacy to the town of New Rochelle for the purpose of erecting a townhouse for transacting town business was held to be a valid charitable bequest. In Magill v. Brown, supra, a bequest to a town for a fire engine and hose was sustained as for a charitable use. These two latter cases were cited with approval in Cresson's Appeal, 30 Pa. St. 437, 450, wherein it was held that a legacy, the income of which was to be "annually, forever, expended in planting and renewing shade trees, especially in situations now exposing my fellow citizens to the heat of the sun," and a legacy "to endow a professorship of the fine arts" in the University of Pennsylvania, were good bequests to charitable uses. The court there said, "'Charity' has been defined to be a general public use. Amb. 651." In Fire Ins. Patrol v. Boyd, 120 Pa. St. 624, 644, 645, 15 Atl. 553, it was held that the fire insurance patrol of Philadelphia, a corporation to save life and property in and contiguous to burning buildings,—being without money capital, but supported by voluntary contributions of fire insurance companies, making and dividing no profits, and saving property, whether insured or not,—is a public charity. In

the course of its opinion the court approved Lord Camden's definition of a charity, expressed in Jones v. Williams, supra, and also quoted approvingly the definition of a charity formulated by Mr. Justice Gray in Jackson v. Phillips, 14 Allen, 539, 556, as follows:

"A charity, in legal sense, may be more fully defined as a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion; by relieving their bodies from disease, suffering, or constraint; by assisting them to establish themselves in life; or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government."

In Perin v. Carey, 24 How. 465, 506, the supreme court of the United States said, "All property held for public purposes is held as a charitable use, in the legal sense of the term 'charity';" and in Ould v. Hospital, supra, the court declared, "A charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of social man."

Guided by the foregoing authorities, we confidently reach the conclusion that the grant by the Penns of the lot of ground in controversy, in trust for the erection thereon of a courthouse for the public use and service of the county of Northampton, was a grant for a charitable use, in the legal sense. Now, as we have already seen, the deed of conveyance contains no express provision for a forfeiture or reverter to the grantors or their heirs in the event of nonuser or misuser, and in the absence of such express provision no right of re-entry to defeat the charitable use is to be implied. It follows, therefore, that the plaintiff was without title to maintain this ejectment. For the nonuse or misuse of the trust property, the county of Northampton is answerable only to those immediately interested in the trust or to the commonwealth of Pennsylvania. Barr v. Weld, supra; Vidal v. Girard's Ex'rs, 2 How. 127, 191; In re Mercer Home for Disabled Clergymen, supra. The court below was right in instructing the jury to find a verdict for the defendants, and accordingly the judgment is affirmed.