(61 South. 765.)

No. 19,211.

Succession of VILLA.

(March 31, 1913. Rehearing Denied April 28, 1913.)

*(Syllabus by the Court.)*

1. CHARITIES (§ 4*)—VALIDITY OF BEQUESTS—DONATIONS FOR PIOUS PURPOSES.

Donations for pious uses are highly favored in law, and are not prohibited fidei commissa or trusts, in the sense of the Civil Code, art. 1520. Girard Heirs v. New Orleans, 2 La. Ann. 898; State v. McDonogh, 8 La. Ann. 171; Roy v. Latiolas, 5 La. Ann. 557; Michel v. Beale, 10 La. Ann. 352; Leonora v. Scott, 10 La. Ann. 660; Armorer v. Case, 9 La. Ann. 288, 61 Am. Dec. 209.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 7, 9, 10; Dec. Dig. § 4.*]

2. CHARITIES (§ 7*)—DONATIONS FOR PIOUS PURPOSES—CONSTRUCTION—"CHURCH."

A bequest to "Dr. J. C. Barr of the Presbyterian church in New Orleans, to be used for the benefit of the said church and any other good work Dr. Barr may see fit to use it for," is not a fidei commissum; and it is a valid legacy to the Presbyterian Church in New Orleans. Mathurin v. Livaudais, 5 Mart. (N. S.) 301; Henderson v. Rost, 5 La. Ann. 441; Succession of Franklin, 7 La. Ann. 395; Upshur v. Briscoe, 37 La. Ann. 138; Succession of Cochrane, 29 La. Ann. 232; Williams v. Western State Lodge, 38 La. Ann. 620; Succession of Auch, 39 La. Ann. 1043, 3 South. 227; Succession of Meunier, 52 La Ann. 79, 26 South. 776, 48 L. R. A. 77; Fink v. Fink, 12 La. Ann. 301.

[Ed. Note.—For other cases, see Charities, Cent. Dig. § 17; Dec. Dig. § 7.*

For other definitions, see Words and Phrases, vol. 2, pp. 1152–1155; vol. 8, p. 7602.]

3. CHARITIES (§ 4*)—VALIDITY—TRUSTS.

Where the residue of an estate donated for pious uses consists of money, which can be immediately delivered by the legatee to the beneficiary, the case presented is that of a naked trust, which does not fall within the prohibition of the Civil Code.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 7, 9, 10; Dec. Dig. § 4.*]

4. WILLS (§ 669*)—COMMISSARY OR ATTORNEY—NECESSITY.

The custom of willing by testament by the intervention of a commissary or attorney in fact is abolished. Civ. Code arts. 1573, 1895, 2031.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1575, 1576; Dec. Dig. § 669.*]

5. WILLS (§ 853*)—CONSTRUCTION—LEGACY TO SEVERAL CONJOINTLY.

Accretion takes place for the benefit of the legatees in case of the legacy being made to several conjointly. Civ. Code, art. 1707; Parkinson v. McDonough, 4 Mart. (N. S.) 246; Lebeau v. Trudeau, 10 La. Ann. 164; Succession of Dupuy, 33 La. Ann. 277; Mackie v. Story, 93 U. S. 589, 23 L. Ed. 986.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 2169; Dec. Dig. § 853.*]

6. WILLS (§ 10*)—VALIDITY—DONATION TO MINISTERS.

Article 1489 of the Civil Code prohibiting ministers of religious worship who have professionally attended a sick person during his last illness from receiving any donation made in their favor by the sick person during that illness, has no application to a case where a minister called on the testator after the will was made, and after the testator had declined spiritual assistance. 2 Fuzier-Hermann, p. 463, No. 463; 2 Dalloz, p. 376.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 18–25; Dec. Dig. § 10.*]

7. WILLS (§ 52*) — PROBATE — BURDEN OF PROOF.

Where opponents to the admission of a will to probate allege that the testator was in articulo mortis at the time of making a bequest, the burden is upon them to prove that allegation.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. § 52.*]

Breaux, C. J., and Provosty, J., dissent.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

The admission of the will of Raphael G. Villa to probate was objected to, and from a decree annulling a bequest to Dr. J. C. Barr he appeals. Reversed and rendered.

Philip H. Mentz and Edmund R. Mabry, both of New Orleans, for appellant. E. M. Stafford and H. W. Robinson, both of New Orleans, for appellees the Villa heirs.

SOMMERVILLE, J. The deceased left a last will and testament executed before a notary public on January 14, 1911, by which, after making three special legacies, the testator bequeathed and devised the remainder of his property as follows:

"The balance of my estate to be given to Rev. J. C. Barr of the Presbyterian church, in New Orleans, to be used for the benefit of said church and any other good work Dr. Barr may see fit to use it for."

The collateral heirs at law of the deceased opposed the probate of the testament on the grounds, among others, that the bequest to Dr. Barr was a prohibited disposition, a fidei commissum, and made to a spiritual advisor during the last illness of the deceased. The opposition was amended by the further averment that the said bequest was null because the will "was made by deceased in articulo mortis, is a donation to the church organization, .or to a clergyman of such, and it is therefore contrary to law, and null."

. The case was tried, and the judge rendered a decree annulling the bequest to Dr. Barr on the ground that the same was a fidei commissum; and Dr. Barr has appealed.

The first question to be examined is whether the legacy to Dr. Barr is a fidei commissum. Dr. Barr is a minister of the gospel, was not related to the deceased, and is pastor of the Lafayette Presbyterian Church in New Orleans. Raphael G. Villa was born and reared in New Orleans. He died in Slidell, La., after an illness of two weeks or more. Three days before his death he made the notarial will in question in Slidell. On the same day of the will the officiating notary, on his own motion, telephoned Dr. Barr in New Orleans that Villa had made a will in his favor, and suggested that he pay the sick man a visit. Dr. Barr went to Slidell on the evening of the same day, and offered his ministerial services to Villa. They were declined. Whereupon Dr. Barr read a psalm, offered a prayer, and departed. Neither Villa nor any member of his family belonged to the Presbyterian church. But it appears that Dr. Barr had officiated at the funerals of Villa's mother and brother, and had invited him, Villa, to attend his church. It does not appear that Villa ever attended Dr. Barr's, or any other, church. In his last illness Villa refused to receive spiritual serv-

ices from any source. He appears, however, to have remembered Dr. Barr's kindness at the funerals of his mother and brother; and, having no near relatives, determined to leave the residue of his estate to Dr. Barr, to be used for the Presbyterian church in New Orleans, and any other good work Dr. Barr might see fit to use it for.

The legacy, being in favor of the Presbyterian church in New Orleans, is for the use which the civil law denominates as a pious use.

The will of Raphael G. Villa conveys the title, or ownership, of the property mentioned to Dr. J. C. Barr for the benefit of the Presbyterian Church in New Orleans. This legacy belongs to a class known in the civil law from the foundation of Christianity by the name of legacies to pious uses. They are an element in the polity of all countries which have preserved the features and jurisprudence of Roman civilization. Such legacies are those which are destined to some work of piety, or object of charity, and have their motive independent of the consideration which the merit of the legatee might procure to them. In this motive consists the distinction between these and ordinary legacies. The term "pious uses" includes not only the encouragement and support of pious and charitable institutions, but those in aid of education, and the advancement of science and the arts. They are viewed with double favor by the law on account of their motives for sacred usages and their advantage to the public weal.

Another clause in the will gives to Dr. Barr the right to use a portion of the legacy made to him for any other good work he might see fit to use it for. We shall give this last clause consideration hereafter.

Dr. Barr stands ready to carry out the charge in the will and use the legacy for the benefit of the Presbyterian church in New Orleans, so far as in him lies, and herein he acts in strict conformity to law; for it is only so far as a condition, charge, or mere right might be impossible or contrary to law that said charge or condition would be considered as not written; if it is compound, and legally possible in one part and impossible in another, this latter part only will be rejected, but what is possible must stand good as a legal volition legally expressed.

"Substitutions and fidei commissa are and remain prohibited."
"Every disposition by which the donee, the heir, or legatee is charged to preserve for or to return a thing to a third person is null, even with regard to the donee, the instituted heir or the legatee." C. C. 1520.
"In all dispositions inter vivos and mortis causa impossible conditions, those which are contrary to the laws or to morals, are reputed not written." C. C. 1519.
"The cause is unlawful, when it is forbidden by law, when it is contra bonos mores (contrary to moral conduct) or to public order." C. C. 1895.

The temporary administration of the property of Mr. Villa, which he gives to Dr. Barr for the benefit of the Presbyterian church in New Orleans, makes no difference as to the title, as we have held in Girard Heirs v. New Orleans, 2 La. Ann. 898, and State of Louisiana v. Executors of McDonogh, 8 La. Ann. 171. In the latter case we say, through Mr. Chief Justice Eustis:

"From what has preceded it is plain that under the civil law it is no objection to the validity of a legacy to pious uses that it is for the benefit of the poor even without any designation of locality. There is no principle better settled than that such legacies are valid. I met with a case in the course of my examination of this subject in which a will was maintained in which a testator instituted the poor his heirs. Indeed, the very generality complained of is an illustration of Christian charity; and uncertainty of individual object at the time of the gift is its characteristic and element."

Again we say in the McDonogh Case:

"I do not think that what was decided or said in that case [Succession of Isaac Franklin, 7 La. Ann. 395] has any application to this. I so expressly stated in the separate opinion which I delivered in that case. I undertook to give my reasons for deciding that the prohibition in the Code of substitution and

fidei commissa intended trust estates. I showed that these words 'trusts' and 'fidei commissa' were used as of the same sense by Kent and Blackstone, and that the Supreme Courts of the United States and of this state had both held the prohibition of fidei commissa to include trusts. That they are not the same thing every one knows. The English trust estate had no place in the Roman law, and its resemblance to the fidei commissum is remote. But that in the common language of jurisprudence the word 'trust' is used to express the fidei commissum is most certain. Gibbon so uses it. Dr. Cooper, an accomplished jurist and scholar, so uses it in his translation of the Institutes. Dr. Brown, in his treatise on the Civil Law, so uses it, and it is used in Woods' Institutes."

If the will of Mr. Villa establishes a legal and an equitable title in Dr. Barr in the technical sense of the English law, wherein the trustee is charged to preserve the property, and then, at some subsequent time, to transfer it to a third person, then the bequest would be null. But it does not do so. The title is temporarily in Dr. Barr, and the destination of the property to a pious use; it is therefore lawful, and the will must be carried into effect.

In Mathurin v. Livaudais, 5 Mart. (N. S.) 301, we say:

"Our Code, it is true, declares that substitutions and fidei commissa are abolished. But the object of this change in our jurisprudence was, as it is well known, to prevent property from being tied up for a length of time in the hands of individuals, and placed out of the reach of commerce. The framers of our Code certainly never contemplated to abolish naked trusts, uncoupled with an interest, which were to be executed immediately. If they had, they would not have specially provided in a subsequent part of the work for testamentary executors, described their duties, and recognized the validity of their acts. The obligation imposed on the legatee by the will of the testator in this case cannot be distinguished from that of an executor, except in the name; and it is the duty of the court to look to things, rather than to words."

We held to the same effect in Milne v. Milne, 17 La. 46, 57. In the case of Heirs of Henderson v. Rost, 5 La. Ann. 441, 472, we say:

"We concur in the opinion with the Supreme Court of this state in the case of Mathurin v. Livaudais that the framers of our Code, in abolishing substitutions and fidei commissa, 'never contemplated to abolish naked trusts, uncoupled with an interest, which were to be executed immediately.'"

See, also, Succession of Franklin, 7 La. Ann. 395, 419, and 438; Upshur v. Briscoe, 37 La. Ann. 138, 143. And in Succession of Cochrane, 29 La. Ann. 232, 236, we say:

"The prohibition of the Code is leveled at these fiduciary bequests, fidei commissa, by which the legatee is used merely as the means of transmitting to one incapable the property which is given to the legatee only for that purpose; and at the tenures by which property is tied up for a length of time in the hands of individuals, and placed out of commerce. It never was the object of the Code 'to abolish naked trusts, uncoupled with an interest, which are to be executed immediately.'"

This case is within the rule of the decisions above referred to, as well as in Williams v. Western State Lodge, 38 La. Ann. 620; Succession of Auch, 39 La. Ann. 1043, 3 South. 227; Succession of Meunier, 52 La. Ann. 79, 26 South. 776, 48 L. R. A. 77.

Dr. J. C. Barr is described in the will as "of the Presbyterian church in New Orleans," and the balance of the estate is given "to be used for the benefit of said church and any other good work that Dr. Barr may see fit to use it for."

"In the interpretation of acts of last will, the intention of the testator must principally be endeavored to be ascertained, without departing, however, from the proper signification of the terms of the testament." Civil Code, 1712.

"A disposition must be understood in the sense in which it can have effect, rather than that in which it can have none." C. C. 1713.

[1] Under the foregoing provisions of the Code, we have held that the testator's intentions are to be ascertained, and his dispositions interpreted so as to be made effectual if possible, without departing from the proper signification of the terms employed. Such intention is his will. This is the first rule of interpretation to which all others are reduced. And a legacy to a pious use is regarded with special favor, which will be con-

trolled in its interpretation by a doctrine of approximation, coeval with the existence of such use. State v. McDonogh, 8 La. Ann. 171; Roy v. Latiolas, 5 La. Ann. 557; Michel v. Beale, 10 La. Ann. 352; Leonora v. Scott, 10 La. Ann. 660; Armorer v. Case, 9 La. Ann. 288, 61 Am. Dec. 209.

The Century Dictionary defines a church to be:

"A particular division of the whole body of Christians possessing the same or similar symbols of doctrines and forms of worship, and united by a common name and history; a Christian denomination; as, the Presbyterian Church; the Church of England; the Church of Rome."

And, as testified to by Dr. Barr, the Presbyterian church in New Orleans is that part of the Presbyterian church of the United States which is located within the territorial limits of New Orleans; that is, the interests of the Presbyterian church as far as they are represented in New Orleans by the different Presbyterian churches in that city, as, he says, would be understood with reference to other denominations when one speaks of the Roman Catholic church in New Orleans, or the Methodist church in New Orleans. It is obvious that the Presbyterian church in New Orleans, referred to by the testator, is that branch of the Christian church known as Presbyterian as contradistinguished from other Christian denominations, and that he intended to benefit that particular church. The testator did not specify any one of the Presbyterian churches established in New Orleans as the object which he wished to benefit. A new will would have to be made for him to benefit any particular Presbyterian church, and this is entirely beyond the power of the court.

"No object is more clearly charitable, in the sense of the law, than the advancement of religion and education; and a bequest to a religious institution is prima facie a bequest for a charitable purpose." 6 Cyc. 913.

In Fink v. Fink, 12 La. Ann. 201, we held a legacy in favor of "protestant widows and orphans" to be valid, and to designate the Protestant widows and orphans in New Orleans, saying that the qualification, "Protestant," does not vitiate the bequest for uncertainty. The corporate authority, administering the charity, must determine its recipients. The Presbyterian church in New Orleans is a well recognized body of Christians, worshiping in the faith denominated Presbyterian, and the legacy in favor of that church must go to the several individual churches which form that portion of the community generally recognized as the Presbyterian church in New Orleans.

[2, 3] These churches are under the immediate jurisdiction of the Presbytery of New Orleans, as testified to by Dr. Barr, and that Presbytery may ask for the execution of the will of Mr. Villa in favor of the Presbyterian churches in New Orleans; or the individual churches might ask for such execution in their own behalf, each one for its share.

The legacy in favor of the "Presbyterian church in the city of New Orleans" is legal and valid, and it must be executed.

The legacy is not only in favor of the Presbyterian church in New Orleans "to be used for the benefit of said church," but it is also to be used for "any other good work Dr. Barr may see fit to use it for."

This last clause of the will is uncertain, indefinite, and violative of the law. The clear intention of the testator in this connection is to confer upon Dr. Barr the selection of the person, object, or purpose to be benefited. Dr. Barr, under the terms of the will, may use a portion of the legacy for "any other good work" which he may fix upon. In such instance there is no one who would be capable of enforcing the trust, if Dr. Barr should fail to use a portion of the legacy to benefit "any other good work" referred to by the testator. Donations to charity must be reasonably certain as to the bene-

ficiaries and objects. 6 Cyc. 939, 940, 949. To permit Dr. Barr to name the beneficiaries of Mr. Villa's testament would be equivalent to permit him to make the will of the deceased. This he cannot do.

[4] "The custom of willing by testament, by the intervention of a commissary or attorney in fact is abolished.

"Thus the institution of heir and all other testamentary dispositions committed to the choice of a third person are null, even should that choice have been limited to a certain number of persons designated by the testator." C. C. 1573.

The above clause of the will must, under the law, be considered as not having been written.

"In all dispositions inter vivos or mortis causa impossible conditions, those which are contrary to the law or to morals, are reputed not written." C. C. 1519.

"Every condition of a thing impossible, or contra bonos mores (repugnant to moral conduct) or prohibited by law, is null, and renders void the agreement which depends on it." C. C. 2031.

"The cause is unlawful, when it is forbidden by law." C. C. 1895.

Therefore the legacy to Dr. Barr, so far as it is given to him for the benefit of "any other good work which Dr. Barr may see fit to use it for," is prohibited by law, and is therefore void.

The legacies to the Presbyterian church in New Orleans and to "any other good work Dr. Barr may see fit to use it for" being made conjointly (Civil Code, 1707), and the latter legacy being null, accretion takes place for the benefit of the other legatee—the Presbyterian church in New Orleans.

Article 1707, C. C., on the subject of accretion, is as follows:

"Accretion shall take place for the benefit of the legatees, in case of the legacy being made to several conjointly.

"The legacy shall be reputed to be made conjointly when it is made by one and the same disposition without the testator's having assigned the part of each co-legatee in the thing bequeathed."

The article of the Code just quoted exactly follows that of France, and it has received from the French courts and jurists abundant construction. Thus, where the disposition was as follows: "I make as my heirs general and universal Mr. Plante and his two sisters to enjoy and dispose of my entire inheritance after my decease by equal portions"—the Court of Cassation adjudged that the declaration as to parties did not apply to the gift itself, but only to the execution of it, or the mode in which the legatees were to divide it between them, and consequently that the right of accretion arose in reference to the part of one of the legatees who died before the testator in favor of the others. Duranton observes:

"We adopt this doctrine. The assignment of equal aliquot parts to each of the legatees, as the half, the third, etc., works a division of the disposition, and makes as many legacies as there are assigned parts; but the mere declaration of equality or rights in the thing bequeathed acts only on the division, and not on the thing itself." Duranton, Book 3, art. 507.

Other French authorities to the same effect could be referred to; but it is unnecessary, as we have heretofore passed upon the question, and the point is settled. In the case of Parkinson v. McDonough, 4 Mart. (N. S.) 246, the substantive words of the bequest were the same as in the case before us, namely:

"I will and bequeath to the orphan children of my old friend Godfrey Duher, * * * Mary, Nancy, James, and Eliza, one share, or one-eighth of all my property, to be equally divided among them."

Our decision was that the legacy was conjoint, and consequently that the portion of one of the legatees who died before the testator went by accretion to the survivors. The distinction between a bequest of a thing to many in equal portions and one wherein a testator leaves a legacy to two or more individuals, to be divided in equal portions, appears extremely subtle and refined. The difference of phraseology in those two modes of bequeathing is so slight as not readily to convey to the mind any difference in ideas,

and can only produce this effect by separating the members in the sentence in the latter phrase; in truth, to create two distinct sentences, each complete in itself, with regard to sense and meaning—the one relating to the disposition of the will, the other to its execution. We might hesitate in adopting the method of construction were it not sanctioned by authority; the doctrine contended for is fully supported by the commentary of Touillier on article 1044 of Code Napoléon, which is precisely similar to our own Code on the same subject.

The above decision was followed in Lebeau v. Trudeau, 10 La. Ann. 164. The language used by the testator in that case was:

"After my debts are paid, my property shall be divided in equal portions, among the persons hereinafter named."

After naming the legatees, the testator said:

"I have hereinbefore mentioned the names of the persons to whom I bequeath all of my property."

After a full discussion of the question, it was decided that the legacy was conjoint, and that accretion took place. We there say:

"The assigning of the parts of each colegatee' means something more than is comprehended in the language of this will which, according to my understanding of it, simply directs their participation of his whole estate in equal portions. I apprehend the terms used in the Code contemplate an express specification and assignment of the respective portions of the legatees, calling each to his particular part. But in the present case there is not that specific and distinct assignment of the parts, which in my judgment is necessary to constitute a distinct legacy to each, of a distinct portion of the deceased's fortune. He appears to me, on the contrary, to have called them conjointly to partake equally in the totality of his estate, and has mentioned the equality of their portions for the purpose of regulating the distribution of that totality. They are conjointly his universal legatees."

See, also, Succession of Dupuy, 33 La. Ann. 277. In Mackie v. Story, 93 U. S. 589, 23 L. Ed. 986, the Supreme Court of the United States held a legacy to be conjoint, which read:

"I will and bequeath to Henry C. Story and Benjamin S. Story all properties I die possessed of, to be divided equally between them."

[5] In the case under consideration, the legacy is made to Dr. Barr "to be used for the benefit of said church and any other good work Dr. Barr may see fit to use it for." There is no specific and distinct assignment of the part which constitutes a legacy to each of said uses; it is therefore conjoint, and, as one of the legatees named cannot take, the whole must go to the remaining residuary legatee.

The property of the estate of the deceased, consisting of movables and immovables, was inventoried as of the value of $4,700.65. The legacies amount to $1,100, and, as the movables were appraised at $700.65, it is evident that all the property will have to be sold for the purpose of settling the estate. The residuum will consist of money in the hands of Dr. Barr, executor, which, under the testament, is bound for the benefit of the Presbyterian church in New Orleans, as directed by the testator.

[6] The next question is whether the legacy is prohibited by article 1489 of the Civil Code, which reads as follows:

"Doctors of physic or surgeons, who have professionally attended a person during the sickness of which he dies, cannot receive any benefit from or donations inter vivos or mortis causa made in their favor by the sick person during that sickness. To this, however, there are the following exceptions:
"1. Remunerative dispositions made on a particular account, regard being had to the means of the disposer and to the services rendered.
"2. Universal disposition in case of consanguinity.
"3. The same rules are observed with regard to ministers of religious worship."

This article is a translation of article 909 of the Code Napoléon, which has been held not applicable to a minister of religion who

did not professionally attend deceased, but, after the making of the testament, administered to the testator absolution and extreme unction. 2 Fuzier-Herman, p. 463, No. 26; 2 Dalloz, p. 376, No. 113. In the instant case Dr. Barr did not see the testator until after the will was made, and consequently spiritual ministrations could not have influenced the confection of the testament.

The last question is whether the legacy is prohibited by section 682 of the Revised Statutes of 1870, as amended by Act No. 2 of Acts of 1881, Second Extra Session, p. 48, which reads, in part, as follows:

"No corporation organized by authority of this act, shall hold property of a value exceeding three hundred thousand dollars; provided, that this restriction shall not apply to corporations organized for the purpose of receiving and administering donations of property for scientific, literary, and educational purposes.

"No church corporation or minister of the gospel, for himself, or the benefit of a church corporation, shall be allowed to accept a bequest made in articulo mortis."

This section, as amended, is a reproduction of section 6 of Act No. 132 of 1855, entitled:

"An act—for the organization of corporations for literary, scientific, religious and charitable purposes."

In the repealing clause of the same act all laws contained in the Civil Code were excepted. And article 3990 of the Revised Statutes provides that, in so far as the sections contained in the Revised Statutes are antagonistic to the provisions of the Revised Civil Code and Code of Practice, "that said Code shall be held and taken as the law governing." Under the Civil Codes of 1825 and 1870, it is provided that all persons may receive by donations mortis causa except such as the law expressly declares incapable. Article 1470. Neither Code excepts corporations of any kind; and the exception as to ministers of religion is confined to those "who have professionally attended a person during the sickness of which he dies." C. C. 1489.

The purpose of section 682, R. S., is to prohibit any corporation organized under the authority of Act No. 132 of 1855 from holding property of a value exceeding $300,000. The further provision that no church corporation or minister of the gospel for himself or the benefit of the church corporation shall be allowed to accept a bequest made in articulo mortis is repugnant to the provisions of the Civil Code of 1870. Under such a prohibition no minister of religion, however closely related or connected with the testator, could accept for himself a bequest made in articulo mortis. The provision above quoted has never before been invoked in this court.

[7] But it becomes unnecessary to consider the question of the constitutionality of said section, or the amendment thereof, as pleaded by the proponent of the will, and to construe its drastic and discriminatory prohibition against the acceptance of mortuary bequests by church corporations and ministers of religion; for the reason that there is no evidence going to show that Raphael G. Villa was in articulo mortis at the time that he made his testament. There is no testimony in the record on the subject. The will was made January 14, 1911, and Mr. Villa died January 17, 1911.

One is said to be in articulo mortis when he is "in the article of death," which according to the Century Dictionary means "at the moment of death; in the last struggle or agony." The definitions found in Webster and the Standard are to the same effect.

The evidence in the record is that Mr. Villa was conscious up to the time of his death, and that he conversed with those around him; and the friend and lady who was nursing him testified, under cross-examination, that it was the physician in attendance who suggested the making of the will, and who added that the doctor said:

"Not that I think he is dying at all, but he is a sick man."

The only other evidence on this point is a voluntary statement made by Dr. Barr, the proponent of the will, who says:

"I found Mr. Villa in a very critical condition. He was very weak; and evidently sick unto death."

He does not say that Mr. Villa was in articulo mortis; and it is uncertain what the witness meant by saying that Mr. Villa was "evidently sick unto death." That expression is old and trite, and is very indefinite. He was not cross-examined as to the meaning of the expression used. We cannot conclude, therefore, that Mr. Villa was "at the very point of death, in the death struggle," on Saturday morning, when the will was made; particularly in view of the fact that he did not die until the following Tuesday morning. The burden was upon the opponents to the admission of the will to probate to prove that the deceased was in articulo mortis at the time of the making of his testament. This they have not done.

It is therefore ordered, adjudged, and decreed that the judgment below be annulled, avoided, and reversed; and it is now ordered that the opposition of the heirs of R. G. Villa to the probate, registry, and execution of the last will and testament of said deceased be overruled and dismissed, with costs in both courts, and that said testament be executed in accordance with its terms and provisions, and that the bequest for "any other good work Dr. Barr may see fit to use it for" lapses for uncertainty as to the legatee, and that the residuum of the estate goes to the conjoint legatee named, Rev. J. C. Barr, for the benefit of the Presbyterian church in New Orleans.

BREAUX, C. J., dissents and files reasons. See 61 South. 771. PROVOSTY, J., dissents.