It is further ordered that the judgment appealed from is affirmed in all other respects.

———

(63 South. 99.)

No. 19,913.

Succession of TILTON.

(June 9, 1913.)

*(Syllabus by the Court.)*

1. CHARITIES (§ 4*) — "LEGACIES TO PIOUS USES"—CONSTRUCTION.

Legacies to pious uses are those which are destined to some work of piety, or object of charity, and have their motive independent of the consideration which the merit of the legatee might procure to them. They are viewed with special favor by the law, and with double favor on account of their motives for sacred usages, and their advantage to the public weal. State v. McDonogh, 8 La. Ann. 246; ·Succ. of Villa, 132 La. 714, 61 South. 765; Williams v. Western Star Lodge, 38 La. Ann. 620; Succ. of Vance, 39 La. Ann. 371, 2 South. 54; Gilmer v. Stone, 120 U. S. 586, 7 Sup. Ct. 689, 30 L. Ed.

734; Jarman on Wills, 376; Wigram on Wills (2d Am. Ed.) 151.
[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 7, 9, 10; Dec. Dig. § 4.*
For other definitions, see Words and Phrases, vol. 5, p. 4057.]

2. WILLS (§ 446*)—VALIDITY—CONSTRUCTION.

"We ought not, without absolute necessity, to let ourselves embrace the alternative of holding a devise void for uncertainty. Where it is possible to give a meaning, we should give it, that the will of the testator may be operative; and, where two or more meanings are presented for consideration, we must be well assured that there is no sort of argument in favor of one view rather than another before we reject the whole." Home for Incurables v. Noble et al., 172 U. S. 384, 19 Sup. Ct. 226, 43 L. Ed. 486; Doe v. Perratt, 6 Mann. & G. 314, 359; Button v. American Tract Society, 23 Vt. 341; Duggan v. Slocum, 92 Fed. 806, 34 C. C. A. 676; St. James Orphan Asylum v. Shelby, 60 Neb. 796, 84 N. W. 273, 83 Am. St. Rep. 553, C. C. 1712, 1713.
[Ed. Note.—For other cases, see Wills, Cent. Dig. § 962; Dec. Dig. § 446.*]

3. CHARITIES (§ 21*)—CERTAINTY AS TO BENEFICIARIES.

A legacy "To Home for Insane, $3,000.00" is herein held to be in favor of "The East Louisiana Hospital for the Insane"; for the reason that the evidence in the record shows that the testatrix had a personal interest in said hospital for the insane, and that she labored under the belief that it was the only home for the insane in the state of Louisiana.
[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 44–50; Dec. Dig. § 21.*]

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Succession of Mrs. Caroline Stannard Tilton, etc. From a judgment in favor of the East Louisiana Hospital for the Insane, the city of New Orleans and the intervening heirs of decedent appeal. Affirmed.

E. Howard McCaleb, of New Orleans, for appellants Flemming and others. J. F. C. Waldo, Asst. City Atty., and I. D. Moore, City Atty., both of New Orleans, for appellant City of New Orleans. R. G. Pleasant, Atty. Gen., and H. H. Kilbourne, Dist. Atty., of Clinton (Daniel Wendling, of New Orleans, of counsel), for appellee.

SOMMERVILLE, J. The will of Mrs. Tilton, of date July 10, 1908, after leaving nu-

merous legacies to relatives and friends, proceeds as follows:

"I give and bequeath to the Board of Commissioners of Audubon Park of New Orleans, the sum of $3,000.00 to be expended by them in beautifying that portion of the park that fronts upon the property of the Tulane University.

"To the Memorial to be erected to General Beauregard, $1,000.00

"To the Charity Hospital of New Orleans, $2,000.00

"To the Saint Anna's Asylum, $2,000.00

"To the Protestant Episcopal Orphan Asylum, Jackson Avenue, New Orleans, $2,000.00

"To the Home for Incurables, $2,000.00

"To Home for Insane, $3,000.00

"To Christian Woman's Exchange, $1,000.00

"After satisfaction of all the foregoing special legacies and bequests, and after payment of all costs, and expenses of settling up my estate, if there should remain any residue, undisposed of, I will and direct that such residue, shall be divided between the beneficiaries of the charitable bequests, heretofore made to various institutions, the division to be made pro rata, in proportion to the amount of the special legacies already made them respectively.

"Should any of the beneficiaries under the will, object to the probate thereof, or in any way directly or indirectly contest or aid in contesting the same, or any of the provisions thereof, or the distributions of my estate thereunder, then and in that event, I annul any bequests herein made to such beneficiary, who shall be absolutely barred and cut off from any share in my estate.

"I hereby appoint and designate the Canal-Louisiana Bank and Trust Company, as my Executor, with full seizin to carry out my wishes.

"I have no heirs, neither ascendants nor descendants."

There were several codicils to the above will, which are not material to the issues now presented in the case.

The Canal Louisiana Bank & Trust Company, testamentary executor, filed a petition in court representing:

"That under the last will and testament of the deceased, which has been duly admitted to probate in this honorable court, there appears a legacy in words and figures, to wit:

" 'To Home for Insane, $3,000.00.'

"That in said will residuary legatees are instituted in the words and figures, to wit: 'After satisfaction of all the foregoing special legacies and bequests, and after payment of all costs and expenses of settling up my estate, if there should remain any residue undisposed of, I will and direct that such residue be divided between the beneficiaries of the charitable bequests heretofore made to various institutions, the division to be made pro rata, in proportion to the amount of the special legacies already made them respectively.' "

The executor further represented that since the will had been admitted to probate claims had been made for the aforesaid legacy "To Home for Insane, $3,000.00," by the city of New Orleans, the "Insane Asylum of the State of Louisiana," at Jackson, now "The East Louisiana Hospital for the Insane" (Act No. 174, p. 259, 1910), and the Louisiana Retreat; and it asks that the different residuary legatees and the claimants of the legacy be cited, and that it be decreed who is entitled to the legacy "To Home for Insane $3,000.00," and it further asks for a judgment decreeing whether or not any one of the parties claiming said legacy should be recognized as one of the residuary legatees instituted in the clause of the will hereinabove set forth. One of the heirs of Mrs. Tilton intervened in this proceeding, and claimed the legacy as having lapsed for uncertainty. Other heirs intervened and set up that if the court found that said legacy had lapsed, or had became caducous, that they were entitled to the portions going "To Home for Insane" under the terms of the will. Other parties intervened; but, as they have not appealed, their pleadings will not be noticed.

There was judgment in favor of the East Louisiana Hospital for the Insane, located at Jackson, La., declaring it to be entitled to the legacy "To Home for Insane $3,000.00," and to a certain portion of the residuum.

The city of New Orleans and the heirs of Mrs. Tilton, who intervened, have appealed.

The language used in designating the legatee in the legacy "To Home for Insane, $3,000.00," is rather indefinite, as there is no institution in the state of Louisiana known by that name, as is disclosed by the record;

and we are called upon to determine between the East Louisiana Hospital for the Insane and the city of New Orleans as to which one, if either, is entitled to said legacy; and, if we find neither is entitled to it, to determine whether the lapsed legacy goes to the heirs of Mrs. Tilton or not.

[1] The rules for the interpretation of wills, as laid down by this court and the courts of other jurisdictions, are somewhat different in respect to bequests in favor of individuals and those in favor of charity. In State v. McDonogh, 8 La. Ann. 246, we say:

"This legacy clearly belongs to a class known to the civil law from the foundation of Christianity by the name of legacies to pious uses. They are an element in the polity of municipal administrations in all countries which have preserved the features and jurisprudence of Roman civilization.

"Legacies to pious uses are those which are destined to some work of piety, or object of charity, and have their motive independent of the consideration which the merit of the legatees might procure to them. In this motive consists the distinction between these and ordinary legacies. Domat lib. 4, tit, 2, § 6, par. 2. * * *

"They are viewed with special favor by the law, 'Ils sont considérés comme privilégés dans l'esprit des lois,' and with double favor on account of their motives for sacred usages and their advantage to the public weal."

See, also, Succ. Villa, 132 La. 714, 61 South. 765.

In the case of Williams v. Western Star Lodge, 38 La. Ann. 629, the above case is cited with approval, and we there say:

"Legacies to pious uses are highly favored by the law, on account of their motives for sacred usages and their advantage to the public weal; and the great consideration which the law attaches to these legacies controls tribunals in their interpretation of them, and has secured for their support a doctrine of approximation which is coeval with their existence."

In the Succession of Vance, 39 La. Ann. 371, 2 South. 54, we say:

"Bequests for pious uses are highly favored by law."

In Gilmer v. Stone, 120 U. S. 586, 7 Sup. Ct. 689, 30 L. Ed. 734, a bequest had been made to the board of home and foreign missions of the state of New York, and the object of the suit was to declare that clause of the will to be void for uncertainty. The court say:

"With respect to charities, gifts may be good which, with respect to individuals, would be void [citing 1 Jarman, Wills, 376]. * * *

"Can it be ascertained by competent evidence which of these various boards were the objects of the testator's bounty?"

And, after referring to certain extrinsic evidence, the court say:

"Of the competency of this evidence there can be no doubt. The purpose of it was to place the court, as far as possible, in the situation in which the testator stood, and thus bring the words employed by him into contact with the circumstances attending the execution of the will. Such proof does not contradict the terms of that instrument, nor tend to wrest the words of the testator from their natural operation. It serves only to identify the institutions described by him (testator), * * * and thus the court is enabled to avail itself of the light which the circumstances, in which the testator was placed at the time he made the will, would throw upon his intentions. 'The law is not so unreasonable,' says Mr. Wigram, 'as to deny to the reader of an instrument the same light which the writer enjoyed.'" Wigram, Wills (2d A. Ed.) 161.

The court affirmed the judgment of the lower court in awarding the bequest to the Board of Foreign and Home Missions of the Presbyterian Church in the United States of America.

[2] In the case of Home for Incurables v. Noble et al., 172 U. S. 383, 19 Sup. Ct. 226, 43 L. Ed. 488, the Supreme Court of the United States quote approvingly the following from Doe et al. v. Perratt, 6 Mann. & G. 314, 359:

"We ought not, without absolute necessity, to let ourselves embrace the alternative of holding a devise void for uncertainty. Where it is possible to give a meaning, we should give it, that the will of the testator may be operative; and, where two or more meanings are presented for consideration, we must be well assured that there is no sort of argument in favor of one view rather than another before we reject the whole. It is true the heir at law shall only be disinherited by clear intention; but, if there be ever so little reason in favor of one construction of a devise rather than any

other, we are, at least, sure that this is nearer the intention of the testator than that the whole should be void and the heir let in. The cases where courts have refused to give a devise any effect, on the ground of uncertainty, are those where it was quite impossible to say what was intended, or where no intention at all had been expressed, rather than cases where several meanings were suggested, and seemed equally entitled to the preference. * * * On this head, it may further be observed that the difficulty of arriving at a conclusion, even the grave doubt which may hang around it, certainly the diversity and the conflict of opinions respecting it, and the circumstances of different persons having attached different meanings to the same words, form no ground whatever of holding a devise void for uncertainty. The difficulty must be so great that it amounts to an impossibility; the doubt so great that there is not even an inclination of the scales one way before we are entitled to adopt the conclusion. Nor have we any right to regard the discrepancy of opinions as any evidence of the uncertainty, while there remains any reasonable ground of preferring one solution to all the rest. The books are full of cases where every shift, if I may so speak, has been resorted to, rather than hold the gift void for uncertainty."

In the case of Button v. American Tract Society, 23 Vt. 341, where a legacy was claimed by two corporations, "The American Tract Society" and "The American Home Missionary Society," the court held that it was manifestly the intention of the testator to convey the property to the American Tract Society, and uses this language:

"So strongly does the law favor carrying into effect the intention of the testator that devises by implication are sustained. Rathbone v. Dyckman [3 Paige (N. Y.)] 10.

"A court never construes a devise void unless it is so absolutely dark that they cannot find out the testator's meaning [citing many cases].

"Trusts for public charitable purposes are favored in equity, and will be upheld where, under the same circumstances, private trusts would fail." Duggan v. Slocum, 92 Fed. 806, 34 C. C. A. 676.

"Courts will view with favor donations by will for charitable purposes, and will endeavor to carry them into effect where the same can be done consistently with the rules of law." St. James Orphan Asylum v. Shelby, 60 Neb. 796, 84 N. W. 273, 83 Am. St. Rep. 553; American Academy v. Harvard College, 78 Mass. 582; Hadley v. Hopkins Academy, 31 Mass. 240; Stuart v. City of Easton, 74 Fed. 854, 21 C. C. A. 146; Mills v. Newberry, 112 Ill. 123, 1 N. E. 156, 54 Am. Rep. 213; 6 Cyc. 903, paragraph 2; Id. 906, 907; 5 A. & E. Ency. of Law, 897; 5 Current Law, Title

"Charitable Gifts," 570; Wood v. Trustees, 26 R. I. 594, 61 Atl. 279; Webster v. Morris, 66 Wis. 366, 28 N. W. 353, 57 Am. Rep. 278; N. Y. Institution for the Blind v. How, 10 N. Y. 84; Woman's Union Miss. Society v. Mead, 131 Ill. 33, 23 N. E. 603; Chromie's Heirs v. Louisville Orphan Asylum, 3 Bush (Ky.) 365.

And with reference to interpreting wills we hold in Succession of Thorame, 12 La. Ann. 384:

"In interpreting a will the intention of the testator must be ascertained as far as practicable, and regard will be had to all the facts and circumstances under which the will was made." C. C. arts. 1712, 1713.

In that case the testator bequeathed one-third of his estate to "The Asylum for the Male Orphans established in the third district of the city of New Orleans," and there were two claimants. We held that:

"The balance of probabilities preponderates strongly in favor of the St. Mary Catholic Orphan Boys Asylum."

And with reference to the extrinsic evidence in that record we say:

"We find mentioned in the will and in the testimony the names of many respectable citizens with whom the testator was on terms of intimacy."

[3] Turning now to a consideration of the evidence in the record in support of the claimants under the will of Mrs. Tilton to the legacy left "To Home for Insane, $3,000.00," we are of the opinion that the city of New Orleans has failed to sustain its claim. The testimony in that connection shows that at the time of making her will by Mrs. Tilton that the city of New Orleans had no home for the insane. The testimony is to the effect that one wing of the parish prison at that time was used for the temporary confinement of the insane until such persons might be transferred to one of the state insane asylums. The city has since that date erected a building wherein the insane are housed and cared for until sent to the state institutions.

Counsel for the city offered in evidence

a copy of the Times Democrat, published in New Orleans, of date December 4, 1907, and about seven months before the date of Mrs. Tilton's will, in which there appeared an article headed, "Home for the Insane"; in which article the condition of the insane in the parish prison was discussed and deplored, and the council of the city was called upon to make appropriation to build and equip a proper place for the insane. Reference was also therein made to the possibility of getting private subscriptions for the purpose indicated, but it was stated that "this should not be done; it is the duty of the city to build it," etc. It is also shown that Mrs. Tilton was a subscriber and reader of the Times Democrat; but it is not shown that she read the article in question, or that it had any effect whatever upon her at the time, or at any time, prior to making her will.

The claim of the city was properly dismissed.

Turning now to the consideration of the testimony on behalf of the East Louisiana Hospital for the Insane, located in Jackson, La., we first refer to the testimony of two of the heirs of Mrs. Tilton, which goes to show that the deceased was much interested in the last named institution.

It appears that in the making of her will Mrs. Tilton remembered many friends and all of her relatives, with the exception of two. While one of these two was not mentioned in the will, the children of that said relative were remembered; and there was really thus left only one relative for whom provision was not therein made. This relative was a grandnephew by the name of William Anderson, an interdict, who was an inmate of the above-named asylum at the time of the making of the will by Mrs. Tilton. This unfortunate young man appears to have been often and very kindly thought of by his aunt, the deceased. Mrs. Willard, a niece of the de-ceased, and a sister of the interdict, while on the witness stand, testified:

"It was through my influence that she didn't leave my brother any money. * * * My brother was the only one that she didn't leave something to. She had no cause to cut him off. They were friendly; she was as interested in him, and more so, than in many relatives whom she left money to, and she wanted to do for him in the best way."

The witness further testified that the testatrix once asked her:

"What would be the best way of helping anybody under such circumstances?"

—referring to the said interdict; and that the testatrix answered her own question before witness had a chance to answer:

"I presume one has no need of money under such circumstances. * * * Well, I suppose the best way to help anybody under those circumstances is to do for the institution."

The witness answered in affirmance, and stated that by so doing she would also help the other patients in that institution coming from prominent families, some of whom were known to the testatrix. This witness further testified that the deceased had given her to understand that her brother, the interdict, would receive $10,000 at the death of the testatrix. But a legacy of $3,000, equal in amount to that given to her favorite heirs, was given "To Home for Insane" instead. Other evidence goes to show that she was greatly interested in the East Louisiana Hospital for the Insane at Jackson. A tornado which had visited that section of the country, and which had wrought considerable destruction to the buildings of the hospital, occasioned much solicitude on the part of the testatrix. This subject was discussed many times with the witness, Mrs. Willard, and at times with Mr. Willard and Mr. Waterman. She examined the pictures in the daily prints showing the extent of the disaster, and expressed her great anxiety to have the buildings restored, so that her nephew might be admitted therein. About

the time of the making of her will, Mrs. Tilton phoned to the witness, Mrs. Willard, asking:

"What is the name of that place where Will, your brother, is? I told her. She said 'Are you positive of the name?' I said, 'I am very positive of the name—it is in Jackson, La.' She said, 'Do you know that it is not Jackson, Miss., because Mr. Tilton's money must stay in Louisiana?' I said, 'No; it is Jackson, La.'"

Further, on cross-examination, this witness testifies as follows:

"Q. Did she ever ask you whether there was any other insane asylum in the state or not? A. She asked me if there could be any mistake on several occasions, when talking about Jackson, La., and about my brother and about the asylum there; * * * she asked if there could be any mistake after her death, and could be it be gotten by any other insane asylum. I said, 'It is impossible; there is no other insane asylum in this state'—I didn't know there was when I told her that," etc.

The deceased seems to have been firmly impressed with the idea that there was no other insane asylum in the state than the one in Jackson, La., where her nephew had been placed. The witness was asked by counsel for the city, with reference to her brother:

"Q. Why didn't you send him to the house of detention? A. Well, I suppose the reason was we wanted to get him to a permanent place. This was not a temporary affair; he was permanently insane, and I did not have such a thing in mind [meaning the house of detention, in the city of New Orleans]."

When asked:

"Q. Your idea was to send him to a home for insane permanently? A. Yes, sir."

Mr. Charles H. Willard, husband of the former witness, testified that the interdict, Anderson, was interdicted in the spring of 1907, and that after interdiction there was considerable delay in getting him to Jackson, and that in the meantime he was confined in the home of the witness, waiting until the repairs to the asylum at Jackson could be made. He further testified as follows:

"Hardly a day passed that she (the testatrix) didn't call me up or bring me to the hotel, and ask why there was so much delay. During the conversation there was a great deal of conversation with regard to Jackson. One Sunday, on one occasion, it was just before Mrs. Willard was down with a severe illness, while he (the interdict) was still at our house, I think the Picayune had in the special magazine section a number of pictures showing the damage done at Jackson, and I took these pictures down with me. I knew that she was interested in all this delay. * * * She was very much worried about Mrs. Willard, and I showed her the pictures, and she became very much interested in them, and I think the whole conversation was about Jackson, and several times after she referred to this place."

Mr. Willard further testified that:

"After Willie was taken to Jackson she asked about him continually, and all I can say she seemed very much interested in the institution."

Mr. Charles Janvier, another witness, testified to a conversation had with the deceased, wherein she expressed her pleasure at the way in which her relative had been treated at the insane asylum, without calling the asylum by any special name, to the recollection of the witness.

Mr. Robert Waterman, one of Mrs. Tilton's relatives and a legatee, testified as follows:

" * * * I called, and she asked me to go out and see Mr. Willard, to see what Mr. Willard was doing with regard to getting William Anderson up to the home for the insane in Jackson. Q. Did she call it the 'Home for the Insane'? A. Home for the Insane—that is what she told me. And I went to Mr. Willard. * * * I went back to my aunt, Mrs. Tilton, and told her what Mr. Willard said. She said, 'Well, I will see you again, but I would like to get him up as soon as possible,' because he was worrying his sister very much, and she was not in good health to stand it. So I think, sometime in June, she sent for me again, and I went to the hotel to see her, and she said that they had gotten Willie Anderson up in the Home for the Insane—had got an order. * * * Q. What did Mrs. Tilton tell you at the St. Charles Hotel on the occasion spoken of by you a few minutes ago? A. About the boy being put in the insane asylum? She said that, Mrs. Willard's mother being her favorite, she wanted the boy placed in a responsible home, to be well taken care of. Q. Now, what did she call this asylum at Jackson? A. She called it the Home for Insane. Q. Who was her favorite, you say? A. Mrs. Willard's mother was her favorite, and she thought so much of her—she had raised Mrs. Willard and had taken care of her and educated her—and she

always said she was always going to provide for her, and look after her, on account of her mother."

An examination of the will shows that of the six charitable bequests made by the deceased that to the "Home for Insane" is the largest, being for $3,000; four of the other charitable bequests are for $2,000 each, and one is for $1,000. This shows, we think, that the testatrix had in mind in making this particular charitable bequest of $3,000 that that institution, having the care and custody of the interdict, Anderson, her relative, was to be benefited more than any other charitable institution because of that fact. And this view is strengthened by the evidence that all the relatives' of the deceased, except the said interdict, were remembered by testatrix in her will by personal bequests.

It is true that the bequest in question could have been made more specific by the addition of the words, "Jackson, Louisiana," to "Home for Insane." But it is more than probable that the exact location of the institution was forgotten by the testatrix when she made her will, and was a matter of indifference to her. She had been told that there could be no mistake as to the location of the institution where her nephew was, as there was no other insane asylum in the state.

The evidence offered for and on behalf of the "East Louisiana Hospital for the Insane" is quite conclusive that that institution was the "Home for Insane" mentioned in Mrs. Tilton's will; and to that institution was given by her the special legacy of $3,000, and also the residuary legacy hereinbefore referred to.

Having come to this conclusion, it becomes unnecessary to consider the claim of the heirs of Mrs. Tilton that the legacy "To Home for Insane, $3,000.00," had lapsed because of the uncertainty or nonexistence of the named legatee.

Judgment affirmed.